UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ROBERT PONZIO, et al., | : | Hon. Joseph H. Rodriguez |
| Plaintiffs, | : | Civil Action No. 18-12544 |
| v. | : | **OPINION** |
| MERCEDES-BENZ USA, LLC, and DAIMLER AG, | : | |
| Defendants. | : | |

This matter comes before the Court on Motions to Dismiss Plaintiffs' Complaint by Defendant Mercedes-Benz USA, LLC ("MBUSA") [Dkt. No. 22], and Defendant Daimler AG ("Daimler") [Dkt. No. 37] (collectively "Defendants"), pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(2), and 12(b)(6). The Court has considered the parties' written submissions and the arguments advanced orally at the hearing held on September 17, 2019. For the reasons stated below, as well as those stated on the record that day, the Court will grant in part and deny in part Defendants' Motions to Dismiss [Dkt. Nos. 22, 37].

### Table of Contents

I.   Background ..................................................................................................... 3

II.  Motion to Dismiss for Lack of Personal Jurisdiction ...................................... 11

   A.   Standard of Review under Fed. R. Civ. Pro. 12(b)(2) .................................. 11

   B.   Personal Jurisdiction Analysis.................................................................... 12

   1.   General Jurisdiction ...................................................................................... 13

   2.   Specific Jurisdiction ...................................................................................... 14

III. Motion to Transfer the Case to the Northern District of Georgia .................. 19

   A.   Transfer Standard ........................................................................................ 19

B.    Transfer Analysis ...................................................................21

1.  Private Factors ......................................................................21

    a.  Plaintiffs' Choice of Forum & Where the Claim Arose .........................21

    b.  Defendants' Choice of Forum & Convenience of the Parties.............. 22

    c.  Ease of Access to Sources of Proof & Convenience of the Witnesses .. 23

2.  Public Interest Factors.............................................................. 23

3.  Related Litigation ................................................................... 24

IV.    <u>Motion to Dismiss Certain Claims for Lack of Standing</u>.............................. 25

  A.    Standing under Fed. R. Civ. Pro. 12(b)(1) ............................... 25

  B.    Standing Analysis ................................................................ 26

V.    <u>Motion to Dismiss for Failure to State a Claim</u> .................................................31

  A.    Failure to State a Claim under Fed. R. Civ. Pro. 12(b)(6) .........................31

  B.    Plaintiffs' Fraud Based Claims .................................................. 33

1.  Rule (9)(b) Pleading .............................................................. 33

2.  Group Pleading .................................................................... 34

3.  Count I: Fraudulent Concealment.............................................. 35

    a.  Knowledge ..................................................................... 37

    b.  The Kansas, Florida, North Carolina, and New Jersey Plaintiffs' Fraudulent Concealment Claims: Special Relationship .................... 45

        i.  North Carolina & Kansas........................................... 46

        ii.  Florida ................................................................ 48

        iii.  New Jersey ......................................................... 50

    c.  Economic Loss Doctrine: California, Florida, and Kansas ................. 53

4.  Plaintiffs' State-Specific Consumer Protection Act Claims................................58

    a.  North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") .......................................................................60

    b.  The New Jersey Consumer Fraud Act ................................. 65

    c.  California Unfair Competition Law And False Advertising Law......... 70

        i.  Plaintiffs' California Unfair Competition Law Claim (California Count I) ............................................... 70

            1.  Unlawful Business Act or Practice ..................... 70

            2.  Unfair Business Practice ......................................71

3.  Fraudulent Practices or Acts ................................ 72

ii.  Fair Advertising Law Claims (California Count II) .................. 75

d.  Claims under Florida, New York, and California ............................... 77

i.  Fair Advertising Law Claims (California Count II) .................. 77

ii.  Florida Deceptive & Unfair Trade Practices Act ("FDUTP") ....80

iii.  The New York General Business Law ("GBL") Sections 349 and 350 ................................................................. 83

C.  Plaintiffs' Remaining Claims ................................................. 86

1.  Plaintiffs Breach of Express Warranty Claims Fail to State a Claim for Plausible Relief ................................................. 86

2.  Plaintiffs' Breach of Implied Warranty Claims ................................. 93

3.  Plaintiffs' Unjust Enrichment Claims (COUNT II) ......................... 94

VI.  Conclusion ................................................................. 99

## I.     Background

This is a putative class action concerning a number of Mercedes-Benz branded vehicles that have "Mars Red" paint ("Class Vehicle(s)"). Plaintiffs Robert Ponzio, Karina Kloczko, Jessica Irene Miller, Thomas Hayes,[1] Alex Acuna, Brian Madsen, Vanessa M. Montgomery, Robert Mull, Hadiya Nelthrope, and Samuel Salgado ("Plaintiffs"), on behalf of themselves and all other potential members of the Nationwide Class and State Classes they seek to represent, filed a Complaint with this Court on August 8, 2018 alleging that the Mars Red paint is defective. [Dkt. No. 1 ("Compl.")]. Specifically, the 360 page complaint claims that Mercedes' Mars Red paint contains a defect that causes the Vehicles' exterior clearcoat to bubble, peel, and flake off, ultimately leading to rusting and corrosion" ("Paint Defect"). (Id. at ¶ 1).

---

[1] Mr. Hayes has voluntarily dismissed all claims against both Defendants and no longer is a part of this action.

Plaintiffs define Mars Red as "an automotive paint color manufactured by PPG Industries, Inc. ("PPG"), formerly known as Pittsburgh Plate Glass Company. The color formulation, which is also commonly known as Fire Opal, has been used by Mercedes between 2004 and 2017." (Id. ¶ 1 n.1). Plaintiffs bring this current action against Daimler and its wholly owned subsidiary, MBUSA. According to the Complaint, "Daimler manufactures and sells automobiles through independent retail dealers, outlets, and authorized dealerships primarily in North America, Europe, and Asia," and designs Class Vehicles, including the paint used on them. (Id. at ¶ 72-74). "MBUSA (itself and through its related entities) engaged in the business of marketing, warranting, distributing, selling, leasing, and servicing automobiles, including the Class Vehicles, throughout the United States." (Id. at ¶ 71).

Plaintiffs' Class Vehicles were subject to Mercedes' New Vehicle Limited Warranty ("NVLW"), which warrants to "that any authorized Mercedes-Benz Center will make any repairs or replacements necessary, to correct defects in material or workmanship arising during the warranty period." (Id. at ¶ 159). The warranty period is "48 months or 50,000 miles, whichever occurs first." (Id.).

The nine (9) named Plaintiffs in this case, each allege that they purchased a Class Vehicle—a Mercedes-Benz with Mars Red Paint—which, at some point, maintained a bubbling/peeling clearcoat.

The named Plaintiff, Mr. Ponzio is the sole Plaintiff who is a citizen of New Jersey and the sole plaintiff to have purchased his Class Vehicle in New Jersey. Mr. Ponzio "specifically wanted to purchase a vehicle in a red color," and alleges that he was aware that other red Mercedes vehicles' color faded overtime. At a Mercedes-Benz Dealer, he discussed his concerns with the sales representative, who "stated that there had

previously been a problem with the Mars Red paint, but that it had since been fixed, and, therefore, there would not be any problems with the Mars Red paint on the Class Vehicle." According to Mr. Ponzio, he relied on this information when he purchased a new 2013 Mars Red SL 550 on June 10, 2013. (Id. ¶¶ 15-19).

Between six months and one year prior to initiating this lawsuit, Ponzio began to notice "that the clearcoat on the hood of his Class Vehicle was peeling, and observed the peeling spread to other parts of his vehicle." As a result, in or about May 2018, Plaintiff Ponzio brought his Class Vehicle to Mercedes-Benz of Cherry Hill. There, personnel assessed the paint on Mr. Ponzio's car "(by taking measurements and using a paint meter) and advised that the entire Vehicle would have to be repainted." At that time, Mr. Ponzio's class vehicle was outside of his warranty. "[D]ealership personnel said that they would have to reach out to Mercedes-Benz's corporate office to explore his options;" he has not heard from them regarding his repainting. But Mr. Ponzio alleges that he was told that "many Mars Red vehicles had come into the dealership with the same problem." (Id.).

Ms. Kloczko resides in Florida, where she purchased a new 2014 Mars Red C350 on May 14, 2014 at an authorized Mercedes dealer in Florida. "Plaintiff specifically wanted to purchase a vehicle in a red color, and the availability of the C350 in Mars Red was a material factor in her decision to purchase her Class Vehicle." Around June 2017, Ms. Kloczko noticed bubbling, peeling, and/or flaking of her vehicle's clear coat. She subsequently brought her Class Vehicle to a Mercedes-Benz of West Palm Beach where she was ultimately told that her Class Vehicle contained a Paint Defect. Due to the number of Class Vehicles that required re-painting, however, there was a six month wait for repair. A second Mercedes-Benz, of Pembroke Pines, sent Plaintiff Kloczko's Class

Vehicle to an AutoNation Collision Center. They repainted the Class Vehicle for over $10,000.00, which was paid for by Plaintiff's insurance company. During the re-painting, that took approximately one month, Plaintiff Kloczko "was still required to make her monthly payment and was not given a comparable loaner vehicle." In August 2017, CarMac appraised Kloczko's Class Vehicle. It "significantly reduced the value" and noted it had paintwork and/or "Needs Paintwork." Autotrader.com categorized the repainting as a Serious Condition and offered Mr. Kloczko a reduced "Kelley Blue Book Instant Cash Offer." (Id. at ¶¶ 20-24).

Plaintiff Irene Miller is also a Florida resident. She purchased a used 2014 Class Vehicle around March 28, 2017, at Southeast Car Agency in Gainesville, Florida, and in or about February 2018 noticed that the clearcoat was peeling. One month after she noticed the paint peeling, she brought her Class Vehicle to the dealership. According to her, the "dealership personnel denied the existence of the Paint Defect and told Plaintiff that the problems with the clearcoat were the result of a bad touch-up paint job on the Class Vehicle, about which personnel also accused her of concealing. . . . even after one of the dealership's service technicians inspected the Vehicle and concluded that it only had the original factory paint." A Mercedes-Benz certified body shop told Ms. Miller that the problem with her Class Vehicle was a common Paint Defect. Ultimately, the Mercedes-Benz dealership provided Ms. Miller with an estimate between $6,000 and $8,000 to have her Class Vehicle repainted. (Id. at ¶¶ 26-30).

Plaintiff Alex Acuna, another Florida Resident, purchased a used 2012 Class Vehicle around December 2014 in Miami, at Off Lease Only. The clearcoat on his Class Vehicle began to bubble in 2015. Around September or October 2016, Acuna's Class Vehicle was in an accident. When he brought his car to Mercedes-Benz Miami for repair, he revealed

the paint problem to a collision consultant. The Consultant advised Mr. Acuna that there was a Paint Defect. "Plaintiff contacted MBUSA and was told that Mercedes was not aware of the Paint Defect and could not understand why the Mercedes-Benz of Miami dealership would have told him that the repainting of his Class Vehicle would be covered under warranty." Plaintiff Acuna claims that when he traded in his Class Vehicle in May 2018, the amount provided was significantly reduced. (Id. at ¶¶ 36-41).

Plaintiff Brian Madsen resides in Kansas, he purchased a used 2013 Class Vehicle on April 9, 2018, at Overland Park Imports, in Overland Park, Kansas. In May 2018, after he noticed his clearcoat was bubbling, he called an authorized Mercedes-Benz dealer. The dealership referred Mr. Madsen to Eveland Bros. Collision Center, a Mercedes-Benz certified body shop, where he was told that his Class Vehicle had the Paint Defect. When Plaintiff Madsen returned to the Mercedes Dealership, he was told that the Paint Defect did not exist and that the bubbling "had to be a result of the vehicle being previously repainted." He found no evidence of repainting, but Mercedes Corporate Office would not pay to repaint his Class Vehicle because it was out of warranty. Mr. Madsen ultimately received an estimate for a repainting from Eveland Bros. Collision Center of almost $13,000. (Id. at ¶¶ 42-46).

Plaintiff Vanessa Montgomery is a resident of California, she purchased a used 2014 Mars Red C250 around February 5, 2015, at a Mercedes-Benz dealership in California. In or about late 2015 or early 2016, she brought her Class Vehicle to the dealership, where she pointed out that the paint was peeling/bubbling, but the "service consultant ignored her concerns." When Ms. Montgomery brought her vehicle in for service, personnel at the dealership again ignored her concerns about her vehicle's paint. One

consultant told her she did not need to take any measures to ameliorate the issue. (Id. at ¶¶ 47-51).

Robert Mull resides in North Carolina. Around December 1, 2017, he purchased a used 2014 Class Vehicle from Jarmon Auto Sales, Inc. in Greenville, North Carolina. In or about January 22, 2018, Plaintiff Mull began to notice that the clearcoat on his Class Vehicle was fading and bubbling and when he brought his Class Vehicle to a Mercedes-Benz dealership, personnel recognized the problem. He was referred to a Mercedes-Benz certified auto shop, where Plaintiff Mull went to obtain an estimate for the repainting of his Vehicle. He was told that his Class Vehicle was affected by a known Paint Defect and given an estimated cost of repair for $3,649.03. This cost was covered by warranty and took approximately six (6) weeks to finish.

Plaintiff Hadiya Nelthrope, from South Carolina, purchased a used 2013 Class Vehicle in or about August 20, 2014 at a Mercedes-Benz dealership in New York. About two months after Plaintiff Nelthrope purchased the Class Vehicle, she observed the vehicle's clear coat bubbling, peeling, and flaking. When Plaintiff Nelthrope took the Class Vehicle in for service, the service consultant stated that the issue was normal wear and tear. Plaintiff Nelthrope attempted to repair the paint problems using the Mars Red touch-up paint, provided by Mercedes, to no avail. (Id. at ¶¶ 57-61).

Samuel Salgado resides in California. On January 25, 2014 he purchased a used 2012 at a dealership in California. "In approximately 2015, Plaintiff noticed that the clearcoat on his Class Vehicle was bubbling, peeling, and flaking." Nothing alleged in the Complaint states that he attempted to have a Mercedes-Benz dealership inspect his Class Vehicle, nor are there allegations that anyone else examined his paint issues. (Id. at ¶¶ 61-66).

According to Plaintiffs', Mercedes markets a wide variety of representations pertaining to their luxury vehicle and slogans such as, "the best or nothing." (Compl. at ¶¶ 101-109). Particular to Mercedes' appearance, Plaintiffs' allege that "Mercedes states in its Vehicle Care Guide the 'emotional experience' that results from the 'visual presence' of its vehicles 'is why every visible surface has been crafted with the finest materials and coatings to ensure the best appearance and durability.' Mercedes even tells customers that '[a]s you might expect, aside from its visual attractiveness, the appearance of your Mercedes-Benz is a main component of its high resale value. (a long-standing additional ownership benefit).'" (Id. at ¶ 110).

Additionally, they claim that Mercedes' advertises an advanced paint technology, paint jobs at the "Paint Shop," and paint finishes, and makes representations concerning the quality of its paint and paint process that, in effect, makes paint a selling and attractive feature to consumers. (Id. at ¶¶ 11-14). Mercedes also describes in detail the process MBUSI undertakes "to ensure the best possible paint job." (Id. at 114). The Complaint further details the representations Mercedes makes about its repairs by "their people" and "their parts." Finally, the Complaint contains numerous allegations that Plaintiffs and Class members were exposed to Mercedes' marketing campaign "touting the supposed quality and durability of the Class Vehicles and their component parts, including paint, and Class members justifiably made their decisions to purchase/lease their Class Vehicles based on Mercedes' misleading marketing that concealed the true, defective nature of the paint used on the Class Vehicles." (Id. at ¶122, 63, 58, 53, 48, 43, 37, 27).

Plaintiffs' assert that Defendants knew of the Paint Defect in the design and pre-production stages. (Id. at ¶ 125). Additionally, they allege that Defendants' knew of the

Paint Defect (1) from its own technical service bulletin (TSB) (Id. at ¶¶136-46); (2) from the warranty data and replacement paint ordered (Id. at ¶¶ 147-150); (3) from Class Member complaints made directly to Mercedes (Id, at ¶¶ 151-53); and (4) based on Class Member Complaints on public forums (Id. at ¶¶ 154-58).

According to Plaintiffs', repainting the Class Vehicles, even if done properly, does not cure the Paint Defect and does not remedy the diminution of value that occurs as a result of the repainting." (Id. at ¶ 166-69). They allege that there is a "stigma" associated with repainted vehicles, that car purchasers "shy away" from these cars which "ring alarm bells" that the vehicle may have been in an accident. They claim this is especially true for luxury cars, such as Mercedes. (Id. at ¶ 170). "As a result of the disparity between the quality of the Class Vehicles negotiated for and the Class Vehicles actually received, Plaintiffs and Class members suffered economic harm. This economic harm can be quantified as: (a) the economic value of an effective remedy that restores the Class Vehicles to their expected conditions (or the economic harm from the lack of that remedy); (b) the discount that Plaintiffs and Class members would have required to accept the Class Vehicles in their actual condition; and/or (c) the diminished value of the Class Vehicles, both those that have been repainted and those that have not." (Id. at ¶ 177).[2]

Consequently, Plaintiffs assert that Defendants' are liable for the following nationwide claims: (1) Fraudulent Concealment (COUNT I); (2) Unjust Enrichment (COUNT II); and (3) Violations of the Magnuson-Moss Warranty Act (COUNT III). Additionally, Plaintiffs' assert claims for Breach of Implied Warranty and Breach of

---

[2] The Court will examine the factual allegations in more detail below, as necessary, in addressing the Defendants' arguments for dismissal.

Express Warranty under each State class, as well as, violations state statues for consumer fraud and unfair or deceptive trade practices. Defendant MBUSA filed a Motion to Dismiss Plaintiffs' Complaint for failure to state a claim, lack of personal jurisdiction and lack of standing [Dkt. No. 22]. Defendant Daimler later filed a Motion to Dismiss based on same [Dkt. No. 37].[3] The Court heard oral argument at a hearing held on September 17, 2019.

## II.    Motion to Dismiss for Lack of Personal Jurisdiction

### A. Standard of Review under Fed. R. Civ. Pro. 12(b)(2)

If a defendant raises lack of personal jurisdiction as a defense, under Fed. R. Civ. P. 12(b)(2), "the plaintiff bears the burden of establishing with reasonable particularity sufficient contacts between the defendant and the forum state to support jurisdiction." Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987). The plaintiff meets it burden by establishing "that the court has either 'general' or 'specific' jurisdiction." Id. A plaintiff's allegations are "taken as true and factual disputes drawn in its favor" when the district court does not hold an evidentiary hearing on the jurisdictional facts. Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004).

The plaintiff "must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence." Turner v. Boyle, No. 12–7224, 2013 WL 1409903, at *3 n.1 (D.N.J. Apr. 8, 2013) (citing Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61 (3d Cir. 1984)); Patterson by Patterson v. F.B.I., 893 F.2d 595, 603–04 (3d Cir. 1990). In its analysis, Courts must consider a variety of

---

[3] Because Defendants' Motions advance identical argument, with few exceptions, the Court, hereinafter, will analyze the Motions simultaneously, referring to MBUSA's motion for citation purposes[Dkt. No. 22]. The Court will address any additional arguments presented by Daimler as needed.

interests and may rely upon matters outside the pleadings. Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty., 137 S. Ct. 1773, 1780 (2017); Turner, 2013 WL 1409903, at *3 n.1.

## B. Personal Jurisdiction Analysis

The first issue to be resolved, is whether this Court has personal jurisdiction over the Defendants in this matter. A federal court exerts personal jurisdiction to the extent authorized by the law of the state in which that court sits. The New Jersey Long–Arm Statute permits an exercise of jurisdiction to the fullest extent allowed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Nicholas v. Saul Stone & Co. LLC, 224 F.3d 179, 184 (3d Cir. 2000); N.J. Ct. R. 4:4–4. Due process limits a state's power to assert personal jurisdiction over a nonresident defendant. Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 413–14, (1984) (citing Pennoyer v. Neff, 95 U.S. 714 (1878)).

Due process is satisfied when a defendant has minimum contacts with a forum state, so that a court's jurisdiction over the defendant "does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (citation omitted) (internal quotation marks omitted). A suit offends due process when there are no ties, contacts, or relations between the state and the defendant. World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 294 (1980); Int'l Shoe, 326 U.S. at 319; see also Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 780 (1984) ("[I]nquiry [into personal jurisdiction] focuses on the relations among the defendant, the forum and the litigation."). Conversely, if a party's contacts meet the constitutional minimum contacts requirement, the district court likely has personal jurisdiction. Miller Yacht, 384 F.3d at 96.

Two types of personal jurisdiction may be asserted over a defendant, specific and general. <u>Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.</u>, 137 S. Ct. 1773, 1780 (2017).

1. *General Jurisdiction*

General jurisdiction allows a court to entertain a dispute even though the defendant's contacts with the forum are unrelated to the events forming the basis of the cause of action. "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." <u>Goodyear Dunlop Tires Operations, S.A. v. Brown</u>, 564 U.S. 915, 924 (2011) (citing Brilmayer et al., <u>A General Look at General Jurisdiction</u>, 66 TEXAS L. REV. 721, 728 (1988)). The Supreme Court of the United States held that, "[w]ith respect to a corporation, the place of incorporation and principal place of business are paradig[m] . . . bases for general jurisdiction." <u>Daimler AG v. Bauman</u>, 571 U.S. 117, 137 (2014) (citations omitted) (internal quotations omitted). "Those affiliations have the virtue of being unique—that is, each ordinarily indicates only one place—as well as easily ascertainable." <u>Id.</u> In exceptional cases, general jurisdiction may exist beyond a corporation's state of incorporation and principal place of business "where its contacts with another forum are so substantial as to render it 'at home' in that state." <u>Chernus v. Logitech, Inc.</u>, No. CV 17-673, 2018 WL 1981481, at *4 (D.N.J. Apr. 27, 2018).

Here, Plaintiffs argue that Defendants are subject to general jurisdiction in this forum because MBUSA's former principal place of business was located in New Jersey, at least until 2015. (Comply. ¶ 67). Plaintiffs, however, concede MBUSA moved its headquarters to Georgia years prior to the filing of this lawsuit. It appears then, that the

two paradigm bases for general jurisdiction are not present as MBUSA is a Delaware company with its current principal place of business in Georgia and Daimler is a foreign corporation with its principal place of business in Stuttgart, Germany. [Dkt. No. 22 at 38; Dkt. No. 37 at 38]. Moreover, the Court finds it unnecessary to determine whether these circumstances further present an "exceptional" case warranting the exercise of general jurisdiction beyond these paradigm foundations because Plaintiffs support a finding of specific jurisdiction.

## 2. *Specific Jurisdiction*

Whether a court can exercise specific personal jurisdiction depends on "the relationship among the defendant, the forum, and the litigation." Pinker v. Roche Holdings Ltd., 292 F.3d 361, 368 (3d Cir. 2002). Contrary to the requirements of general jurisdiction, "establishing specific jurisdiction, at a minimum, requires only that a party be shown to have committed at least one act in the relevant forum which is substantially related to the claim being adjudicated." Grimes v. Vitalink Comms. Corp., 17 F.3d 1553, 1559 (3d Cir. 1994). In this Circuit, three requirements must be met for specific jurisdiction to exist:

> First, the defendant must have "purposefully directed [its] activities" at the forum. Second, the litigation must "arise out of or relate to" at least one of those activities. And third, if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise "comport[s] with 'fair play and substantial justice.'"

O'Connor v. Sandy Lane Hotel Co., 496 F.3d 312, 317 (3d Cir. 2007) (citations omitted).

Applying the settled principles of specific jurisdiction, the Supreme Court in BMS further explained that:

> In order for a court to exercise specific jurisdiction over a claim, there must be an "affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum

State." When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State.

Bristol-Myers Squibb Co., 137 S. Ct. at 1781. (quoting Goodyear Dunlop Tires, 564 U.S. at 919).

Relying on the Supreme Court Decision in Bristol-Myers Squibb ("BMS"), Defendants' contend that this Court lacks specific personal jurisdiction as to claims by Plaintiffs with no connection to New Jersey. In BMS, more than 600 individuals initiated a mass tort action in California state court against Bristol-Myers Squibb Company for product liability concerning its pharmaceutical drug, Plavix. See generally, Id. Bristol-Myers—incorporated in Delaware and headquartered in New York—argued that the California Court lacked specific jurisdiction as to the claims by non-California resident plaintiffs. A majority of the plaintiffs in the case were not California residents, not prescribed Plavix in California, and did not consume Plavix in California. In BMS, the Defendant Corporations' only contact with the forum state was sales of the pharmaceutical drug— it did not develop, create a marketing strategy, or "manufacture, label, package, or work on the regulatory approval of the product in [the forum state]," but instead, engaged in all of these activities in [two different states]." Id. at 1778.

Therefore, the Court ruled that the California state court did not maintain specific personal jurisdiction to entertain the non-resident claims. Id. at 1787. BMS further held that "[t]he mere fact that [some] plaintiffs were prescribed, obtained, and ingested Plavix in California — and allegedly sustained the same injuries as did the nonresidents — does not allow the State to assert specific jurisdiction over the nonresidents' claims." Id. at 1781. Here, Defendants argue that, like in BMS, there is an insufficient basis to support specific jurisdiction because "the only nexus between the non-New Jersey

plaintiffs' claims and the State of New Jersey is that the non-New Jersey plaintiffs allegedly suffered the same injury as Ponzio." [Dkt. No. 22 at 39].[4]

The Court would be remiss if it did not acknowledge that the <u>BMS</u> Court, in dealing with a mass tort action, left open "the question whether its opinion . . . would also apply to a class action in which a plaintiff injured in the forum State seeks to represent a nationwide class of plaintiffs, not all of whom were injured there." <u>Id.</u> at 1789, n. 4 (Sotomayor, J., dissenting). In fact, Plaintiffs' argue, in-part, that BMS is inapplicable to this case. [Dkt. No. 27 at 42]. A majority of federal courts have found that the <u>BMS</u> holding does not apply to <u>unnamed</u> plaintiffs in a putative class action; however, those courts have also held that nothing in the <u>BMS</u> decision suggests that it would not apply to <u>named</u> class representatives. <u>See</u> <u>Chernus</u>, 2018 U.S. Dist. LEXIS 70784, at *19; <u>Horowitz v. AT&T Inc.,</u> No. 3:17-CV-4827, 2018 WL 1942525, at *15 (D.N.J. Apr. 25, 2018), <u>opinion clarified on denial of reconsideration,</u> No. 3:17-CV-4827, 2019 WL 77306 (D.N.J. Jan. 2, 2019).

Therefore, it is of significance that the jurisdictional issue presented in this case concerns claims against the Defendants by <u>named</u> Plaintiffs. In a class action, "it is the named plaintiff's claim that must arise out of or result from the defendant's forum-related activities, not the claims of the unnamed members of the proposed class, who are not party to the litigation absent class certification." <u>Aliano v. Quaker Oats Co.</u>, No. 16-3087, 2017 U.S. Dist. LEXIS 1158, at *13-14 (N.D. Ill. Jan. 4, 2017). The Court agrees,

---

[4] Here, Plaintiff Ponzio is the only plaintiff out of the nine named Plaintiffs who a resident of New Jersey and purchased his class vehicle in New Jersey. Defendants do not allege that Plaintiff Ponzio has failed to satisfy personal jurisdiction over Defendants.

therefore, that the principles announced in <u>BMS</u> are applicable to the present action.[5] To that end, Plaintiffs contend that jurisdiction exists because, unlike in <u>BMS</u>, "the relevant unlawful conduct at issue in this case as to all class members occurred primarily in New Jersey," the forum state. [Dkt. No. 27 at 41]. The Court agrees.

According to Plaintiffs, Defendants' "unlawful" activities include: (1) marketing the quality of its vehicles and its paint and paint process; and (2) failing to disclose a defect with Mars Red paint and/or paint process. Currently before the Court are claims for unjust enrichment, fraudulent concealment, breach of warranty, and violations of state consumer fraud statutes. It follows that the essential issue to be resolved in this matter, is whether Plaintiffs' have established that Defendants alleged material misrepresentations and/or omissions, <u>made in New Jersey</u>, are sufficient to warrant personal jurisdiction over claims of non-New Jersey Plaintiffs.[6]

Plaintiffs Complaint alleges that MBUSA has been marketing and "has actively concealed the existence and nature of the Paint Defect from Class members since at least

---

[5] <u>See</u> <u>also</u> <u>Greene v. Mizuho Bank, Ltd.</u>, No. 14–1437, 2017 WL 7410565, at *4 (N.D. Ill. Dec. 11, 2017) ("Nothing in *Bristol–Myers* suggests that it does not apply to named plaintiffs in a putative class action; rather, the Court announced a general principal—that due process requires a connection between the forum and the specific claims at issue. That principle applies with equal force whether or not the plaintiff is a putative class representative."); <u>Gaines v. Gen. Motors, LLC</u>, No. 17CV1351, 2018 WL 3752336, at *2 (S.D. Cal. Aug. 7, 2018) ("Though courts seem to be divided as to unnamed parties in class actions, most courts that have had considered the question appear to have concluded that *Bristol-Myers* applies to named parties."); <u>Maclin v. Reliable Reports of Tex., Inc.</u>, No. 17 CV 2612, 2018 WL 1468821, at *4 (N.D. Ohio Mar. 26, 2018) (applying the principles in <u>BMS</u> to a putative nationwide FLSA action); <u>Roy v. FedEx Ground Package Sys., Inc.</u>, No. 17-CV-30116, 2018 WL 2324092, at *9 (D. Mass. May 22, 2018) ("While it is true that *Bristol-Myers* brought the issue of personal jurisdiction into sharp focus, there can be no doubt that the "settled principles" of specific jurisdiction on which the *Bristol-Myers* Court relied apply here, notwithstanding that this case is pending in federal and not state court.").

[6] When the Court asked Plaintiffs' Counsel: "if, in fact, the serious question is, was the marketing and omissions of sufficient gravity to justify a cause of action, and the answer to that is no, then the entire case goes away"? Counsel responded: "Sure. Yes." (Tr. 31:7-12).

2010." (Id. at ¶¶ 107, 156, 185(c)). From that time, until at least July 2015, MBUSA'a

headquarters were located in New Jersey. (Id.). Non-New Jersey resident Plaintiffs,

Kloczko, Acuna, Montgomery, Nelthrope, and Salgado, purchased Class Vehicles within

this timeframe, prior to 2015. Importantly, all named Plaintiffs allege that they viewed

Mercedes marketing material prior to purchasing their vehicle and each relied on the

alleged misrepresentations made through Mercedes' marketing and advertisements

when they purchased their Mars Red vehicles. In addition, all of Plaintiffs' Class

Vehicles' are within 2012 and 2015 model years. (Compl. ¶¶ 15-66).

In effect, Defendants maintained the requisite affiliation between the forum, New

Jersey, and the underlying controversy, in that Defendants' general marketing decisions

emanated from New Jersey, prior to the purchase of the majority of Class Vehicles and

during the development of all vehicles involved. Thus, unlike in BMS, Defendants here

purposefully availed themselves of privileges of conducting its activities in New Jersey,

and all named Plaintiffs current claims result from those contacts. To be sure,

Defendants' activities in the forum—alleged misrepresentations and omissions—are not

only related to any fraud based claims, but also substantially relate to all of the claims in

this action because here, Plaintiffs allege that their warranties were tolled by the

fraudulent concealment of the Paint Defect.[7] (Oral Arg. Tr. 60:12-61:5).

Defendants' fail to argue that its contacts, which the court must accept as true, are

insufficient to establish jurisdiction. [See Dkt. No. 35 at 15-16]. Rather, Defendants'

argument against specific jurisdiction rests entirely on its contention that out of state

---

[7] Plaintiffs' counsel told the Court that the tolling argument applied across of Plaintiffs' claims, that in the context of warranty, they claim until the plaintiff knows of the defect, the warranty period it does not accrue. (Oral Arg. Tr. 57-60).

Plaintiffs cannot sustain personal jurisdiction over out of state Defendants based solely on their similar injury to the resident-Plaintiff. As explained, however, Plaintiffs do not claim jurisdiction on that basis. Therefore, the Plaintiffs have established with reasonable particularity sufficient contacts between the defendants and the forum state, New Jersey, thereby presenting a prima facie case for the exercise of personal jurisdiction by this Court. Furthermore, considering the years of extensive activity in this state, and continuing business here to present, the exercise of personal jurisdiction over Defendants is fair. Delphix Corp. v. Embarcadero Techs., Inc., 749 F. App'x 502, 506 (9th Cir. 2018) ("When every aspect of the case – from the parties to the underlying disputed rights – is completely centered in [the forum], we cannot say the exercise of specific jurisdiction in [the forum] would be unfair or unreasonable."). Thus, the Court will deny Defendants' Motions to Dismiss for lack of personal jurisdiction.

III.     Motion to Transfer the Case to the Northern District of Georgia

**A. Transfer Standard**

Having decided that the Court maintains personal jurisdiction over Defendants, the Court must address Defendants alternative argument, that the Court should transfer this matter pursuant to 28 U.S.C. Section 1404(a) to the Northern District of Georgia. [Dkt. No. 37 at 43].

Section 1404 provides: "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district . . . where it might have been brought." 28 U.S.C. § 1404(a). Analysis under § 1404 is flexible and must be made on the unique facts of each case. Ricoh Co., Ltd. v. Honeywell, Inc., 817 F. Supp. 473, 479 (D.N.J. 1993). The moving party bears the burden of establishing that the transfer is appropriate and must establish that the alternate forum is more

convenient than the present forum. Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995). The Third Circuit has enumerated a number of private and public factors to be weighed when deciding a motion to transfer venue under § 1404(a).

The private interest factors incorporate the preferences of the parties in the context of the litigation, and include: (1) the choice of forum of the plaintiff; (2) the defendant's preference; (3) the ease of access to sources of proof; (4) the convenience of the witnesses-only to the extent that a witness may actually be unavailable for trial in one of the fora; and (5) where the claim arose. The second category analyzes the public interest including (1) practical considerations which could make the litigation easier and more expeditious, or inexpensive; (2) court congestion and administrative difficulties; (3) the local interest in resolving local controversies at home; and (4) the public policies of the fora. Mendoza v. U.S. Custom & Border Protection, No. 05-6017, 2007 WL 842011, at *3 (D.N.J. March 19, 2007) (citing Jumara, 55 F.3d at 879) (citations omitted).

When jurisdiction is based on the diversity of the parties pursuant to 28 U.S.C. § 1332, such as the present case, a civil action may be brought in:

> (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391. Defendants submit that the "Northern District of Georgia is a district where this case 'might have been brought,' as it is where Defendant MBUSA's principal place of business is located." [Dkt. No. 37 at 43 (citing 28 U.S.C. § 1404(a); Compl. ¶ 67)]. The Court agrees, as the Northern District of Georgia is a judicial district in which Defendant MBUSA resides.

**B. Transfer Analysis**

Defendants argue that both the private and public factors weigh in favor off transfer or are otherwise neutral. In arguing for transfer Defendants only assert: (1) Plaintiffs' choice of forum deserves substantially less deference; (2) a majority of Plaintiffs reside in states that are closer to Georgia; (3) the District Court of New Jersey is more congested than the Northern District Court of Georgia; and (4) a duplicative action to the present one, exists in Georgia. For the reasons that follow, The Court finds that Defendants have failed to meet their burden.

*1. Private Factors*

a. Plaintiffs' Choice of Forum & Where the Claim Arose

First, in the Third Circuit, "Plaintiffs' choice of forum is a paramount consideration that should not lightly be disturbed." Clark v. Burger King Corp., 255 F. Supp. 2d 334, 338 (D.N.J.2003) (quoting Ayling v. Travelers Prop. Casualty Corp., No. 99–3243, 1999 WL 994403, at *2 (E.D. Pa. Oct.28, 1999)). Generally, unless the defendant can show that the inconvenience to the parties strongly favors another forum, plaintiff's choice of forum should prevail. Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970). Courts, however, give substantially less weight to a plaintiffs forum choice when the dispute at the heart of a lawsuit occurred almost entirely in another state. See, e.g., NCR Credit Corp. v. Ye Seekers Horizon, Inc., 17 F. Supp. 2d 317, 321 (D.N.J .1998); Ricoh Co., 817 F. Supp. at 481–82. Plaintiff's choice of forum may also be afforded less deference when, as here, Plaintiff sues on behalf of a putative class. See Huang v. Sonus Networks, Inc., No. 15-2407, 2016 WL 1090436, at *2 (D.N.J. Mar. 21, 2016); Santomenno v. Transamerica Life Ins. Co., No. CIV.A. 11-736, 2012 WL 1113615, at *5 (D.N.J. Mar. 30, 2012); Johnson v. Nextel Commc'ns, Inc., No. 06-5547, 2007 WL

2814649, at *4 (D.N.J. Sept. 21, 2007); <u>Impervious Paint Indus., Ltd. v. Ashland Oil, Inc.</u>, 444 F. Supp. 465, 467 (E.D. Pa. 1978) ("[W]here there are many potential plaintiffs scattered across the country, the choice of this plaintiff deserves less weight.").

Plaintiffs, here, chose to bring suit in New Jersey, where lead Plaintiff Ponzio resides and where a substantial part of the events or omissions giving rise to the claims occurred. Plaintiffs undoubtedly seek to represent other potential plaintiffs from all over the country, and thus the Court agrees that their forum choice deserves less weight in that regard. But the actions at the heart of this present lawsuit—alleged misrepresentations, omissions, and concealment of the Paint Defect—occurred almost entirely in New Jersey. Accordingly, while Plaintiffs' choice of forum here may be given less weight to the extent that it is a class action, it should be afforded deference because the operative facts of the lawsuit have a much greater connection to this state, than Georgia. Therefore, Plaintiffs' choice of forum (factor one) still weighs against transfer.

Similarly, factor five—where the claim arose—weighs heavily against transfer. At the time that a majority, if not all, claims arose, MBUSA was located in New Jersey. Defendants provide no argument to the contrary.

### b. Defendants Choice of Forum & Convivence of the Parties

Defendants submit that their preference in forum— the Northern District of Georgia—is more convenient for them because MBUSA resides there now. The Court agrees. MBUSA currently maintains its headquarters in Georgia; it follows that factor two weighs in favor of transfer.

With respect to factor four—convenience of the parties—Defendants argue that Georgia is the more convenient forum because most of the named Plaintiffs are from the southeast. That fact is inapposite since this case is a putative class action. <u>Huang v.</u>

Sonus Networks, Inc., No. 15-2407 , 2016 WL 1090436, at *3 (D.N.J. Mar. 21, 2016)

("Presumably, class members will be located throughout the country, and would have to

travel to participate in the litigation no matter where this case is located, rendering New

Jersey no more convenient than [Georgia]."). Moreover, Defendants still conduct

significant business in this state and are both large corporation with vast resources.

Indeed, Defendants do not suggest any undue burden in litigating in this forum.

Accordingly, this factor is neutral.

      c.   Ease of Access to Sources of Proof & Convenience of the Witnesses

Neither Plaintiffs nor Defendants submit that the ease of access to sources of

proof or the convenience of the witnesses—to the extent that a witness may actually be

unavailable for trial—favor or disfavor transfer. Therefore, both of these private factors

are also neutral.

    2.  *Public Interest Factors*

With regard to the public interest factors, Defendants fail to put forth evidence

pertaining to any factor aside from court congestion. To that end, Defendants submit

that during "the 12-month period ending June 30, 2018, the District of New Jersey

experienced an average of 1,327 new cases per judge, compared to 731 in the Northern

District of Georgia. Civil cases in the District of New Jersey take a median time of 7.5

months from filing to disposition, compared to 6.6 months in the Northern District of

Georgia." [Dkt. No. 37 at 44]. The court agrees that this weighs in favor of transferring

to the Northern District of Georgia.

However, the Court will not ignore the local interest in resolving local

controversies at home. The unique circumstances of this case leave New Jersey with a

great interest in resolving Plaintiffs claims. MBUSA for many years enjoyed the

protections of New Jersey law. "New Jersey has an interest in deterring misconduct by corporations headquartered within its borders." Maniscalco v. Brother Int'l (USA) Corp., 709 F.3d 202, 210 (3d Cir. 2013). Although Georgia undoubtedly has an interest in litigating this case as well, as MBUSA maintains its headquarters there now, the Court finds that New Jersey has a greater interest. Because the actions in question here are alleged to have occurred since 2010, six named Plaintiffs purchased cars before MBUSA's re-location, and all Plaintiffs purchased Class Vehicles manufactured prior to Mercedes re-location, the interest in deterring conduct that occurred almost exclusively in this state is high.

   *3. Related Litigation*

   Finally, Defendants argue for transfer in the interest of justice, based on the fact that "a duplicative action alleging the same 'Mars Red' paint defect is pending" in the Northern District of Georgia. [Dkt. No. 37 at 44] (citing Pinon v. Daimler AG and Mercedes-Benz USA, LLC, No. 1:18-cv-03984 (N.D. Ga. filed Aug. 21, 2018) ("Pinon")). The Defendants are correct that Pinon involves another putative class action asserting the same allegations as here. The case was filed 2 weeks after the present action.

   Where related lawsuits exist, "it is in the interests of justice to permit suits involving the same parties and issues to proceed before one court and not simultaneously before two tribunals." Honeywell, 817 F. Supp. at 487 (quoting Pall Corp. v. Bentley Labs., Inc., 523 F. Supp. 450, 453 (D. Del. 1981)). That being said, when the related suits "involving the same parties and subject matter are pending concurrently, the first-filed suit should have priority absent a showing that the balance of inconvenience favors transfer or unless there are special circumstances which justify giving priority to the second suit." Id. at 487. Here, Plaintiff filed the present lawsuit

first. Defendants have not supplied the Court with "special circumstances" giving the second suit, in Georgia, priority.

There are exceptions to this first-to-file rule, which provide that a court may decline to apply the rule "where there is evidence of bad faith, anticipatory suit, or forum shopping." Catanese v. Unilever, 774 F. Supp. 2d 684, 690 (D.N.J. 2011). The Defendants provide no allegations or evidence to suggest the exceptions apply.

"There is no rigid rule governing a transfer determination by a court; '[e]ach case turns on its facts.'" Lawrence v. Xerox Corp., 56 F. Supp. 2d 442, 450 (D.N.J. 1999) (quoting Lacey v. Cessna Aircraft Co., 862 F.2d 38, 43 (3d Cir.1988)). In sum, the facts here show that New Jersey has more connection to the cause of action than does Georgia, and that this action was filed before the copy-cat action pending in Georgia's Northern District. Furthermore, the Court finds that New Jersey is the district in which the substantial events giving rise to Plaintiffs' claim arose, and the district with the greater interest in resolving this case. Considering all other factors neutral, the Court finds insufficient grounds for transfer of venue. Therefore, the Court will deny Defendants' Motions to transfer this case to the Northern District of Georgia.

IV.     Motion to Dismiss Certain Claims for Lack of Standing

**A. Standing under Fed. R. Civ. Pro. 12(b)(1)**

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits the dismissal of an action for "lack of subject matter jurisdiction." "A motion to dismiss for want of standing is also properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter." Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007). "The party invoking federal jurisdiction bears the burden of establishing the elements of standing, and each element must be supported in the same way as any other matter in which the

plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." <u>Focus v.</u> <u>Allegheny Cnty. Court of Common Pleas</u>, 75 F.3d 834, 838 (3d Cir. 1996) (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

A Rule 12(b)(1) motion may be treated as either a facial or factual challenge to the court's subject matter jurisdiction. <u>Davis v. Wells Fargo</u>, 824 F.3d 333, 346 (3d Cir. 2016). A facial attack contests the sufficiency of the pleadings, whereas a factual attack contests the sufficiency of jurisdictional facts. <u>Lincoln Ben. Life Co. v. AEI Life, LLC</u>, 800 F.3d 99, 105 (3d Cir. 2015). When considering a facial attack, the court accepts the plaintiff's well-pleaded factual allegations as true and draws all reasonable inferences from those allegations in the plaintiff's favor. <u>In re</u> <u>Horizon Healthcare Services Inc. Data Breach Litigation</u>, 846 F.3d 625, 633 (3d Cir. 2017). When reviewing a factual attack, the court may weigh and consider evidence outside the pleadings. <u>Gould Elecs. Inc. v. United States</u>, 220 F.3d 169, 176 (3d Cir. 2000).

**B. Standing Analysis**

Defendants submit that "[t]he Court should dismiss the Complaint's non-New Jersey nationwide and non-New Jersey state-specific claims for lack of standing because they are brought on behalf of putative class members whose claims arise under the laws of states in which named plaintiffs did not suffer any alleged harm." [Dkt. No. 22 at 41].

The Constitution limits the subject matter jurisdiction of federal courts to "cases" and "controversies." <u>See</u> U.S. Art. III § 2. To establish Article III standing, a plaintiff must plead "an 'injury in fact' or an 'invasion of a legally protected interest that is concrete and particularized,' . . . a 'causal connection between the injury and the conduct complained of,' and 'a likelihood that the injury will be redressed by a favorable

decision.' " In re Horizon Healthcare Servs. Inc. Data Breach Litig., 846 F.3d 625, 633 (3d Cir. 2017) (quoting Lujan, 504 U.S. at 560–61 (1992)). See also Anjelino v. N.Y. Times Co., 200 F.3d 73, 88 (3d Cir. 2000) ("Standing is established at the pleading stage by setting forth specific facts that indicate that the party has been injured in fact or that injury is imminent, that the challenged action is causally connected to the actual or imminent injury, and that the injury may be redressed by the cause of action.").

In a putative class action context, Plaintiffs' correctly identify that Third Circuit precedent holds "that unnamed, putative class members need not establish Article III standing. Instead, the 'cases or controversies' requirement is satisfied so long as a class representative has standing, whether in the context of a settlement or litigation class." Neale v. Volvo Cars of N. Am., LLC, 794 F.3d 353, 362 (3d Cir. 2015) (emphasis added). Furthermore, "[t]hough the named plaintiff need not demonstrate that all other members of the class have standing before certification, 'class representatives must meet Article III standing requirements the moment a complaint is filed.'" In re: Lamictal Indirect Purchaser & Antitrust Consumer Litig., 172 F. Supp. 3d 724, 753 (D.N.J. 2016) (quoting Neale, 794 F.3d at 362).

Plaintiffs' Complaint asserts state specific claims under the laws of all fifty (50) states, and the District of Columbia. (Compl. ¶¶ 192, 249-1994). The nine named Plaintiffs, however, collectively, represent only (6) of those states—New Jersey, California, Florida, Kansas, New York, North Carolina, and South Carolina.[8] Defendants' do not contend that the named Plaintiffs lacks standing to bring claims under their respective states' law, they submit that they lack standing to bring claims

---

[8] One Plaintiff purchased his vehicle in a different state

under the laws of states they do not represent. Thus, the question before the Court becomes whether, at this stage, named Plaintiffs are required to establish standing for each claim asserted in the complaint. See McGuire v. BMW of N. Am., LLC, Civil Action No. 13-7356, 2014 U.S. Dist. LEXIS 77009, at *15 (D.N.J. June 6, 2014); In Re Magnesium Oxide, 2011 U.S. Dist. LEXIS 121373, at *25-6. This particular issue is unresolved among district courts. See, e.g., Ramirez v. STI Prepaid LLC, 644 F. Supp. 2d 496, 505 (D.N.J. Mar. 18, 2009); In re Grand Theft Auto Video Game Consumer Litig., No. 06-1739, 2006 U.S. Dist. LEXIS 78064, at *3 (S.D.N.Y. Oct. 25, 2006); In re Magnesium Oxide, 2011 U.S. Dist. LEXIS 121373, at *7-10; Ulrich v. Walker, No. 92-1078, 1992 U.S. Dist. LEXIS 13126, at *1-2 (E.D. Pa. Aug. 28, 1992).

In opposition, Plaintiffs submit that a standing analysis is premature at this stage and more suited as a class certification issue under Rule 23. [Dkt. No. 27 at 40]. The Court disagrees.

Plaintiffs' rely mainly on Neale in arguing that dismissal of the majority of its state specific claims is improper. The Third Circuit's holding in Neale, as stated above, pertained to "unnamed" members and does not squarely address the issue presented before this Court—whether named plaintiffs have standing to assert claims set forth in their Complaint. Neale, does not alter the fact that, "[i]n the context of a class action, Article III must be satisfied 'by at least one named plaintiff.' Neale, 794 F.3d at 359 (quoting McNair v. Synapse Group Inc., 672 F.3d 213, 223 (3d. Cir. 2012)).

The Supreme Court's "standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 337 (2006). In fact, "if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek

relief on behalf of himself or any other member of the class." O'Shea v. Littleton, 414 U.S. 488, 494 (1974); see also In re Magnesium Oxide Antitrust Litig., No. 10-5943, 2011 U.S. Dist. LEXIS 121373, at *37-38 (D.N.J. Oct. 20, 2011) (noting that if a plaintiff did not have to demonstrate standing for each claim, "a plaintiff would be able to bring a class action complaint under the laws of nearly every state in the Union without having to allege concrete, particularized injuries relating to those states, thereby dragging defendants into expensive nationwide class discovery, potentially without a good-faith basis. In other words, the plaintiff would have to do "no more than name the preserve on which he intends to hunt.").

Accordingly, the Court finds that Plaintiffs' lack standing to assert claims on behalf of unnamed plaintiffs in jurisdictions where Plaintiffs have suffered no alleged injury. See Semeran v. Blackberry Corp., No. CV 15-750, 2016 WL 3647966, at *6 (D.N.J. July 6, 2016) (stating that "[a] named plaintiff must be a part of the class which he seeks to represent" and deciding standing issues at the pleadings stage "in light of the fact that [p]laintiff was not a member of the Multi-State Class, and because such a class would require the court to apply the substantive law from numerous other states."); McGuire v. BMW of N. Am., LLC, 2014 U.S. Dist. LEXIS 77009, at *17 (D.N.J. June 6, 2014) ("Plaintiff here lacks standing to assert claims under the laws of the states in which he does not reside, or in which he suffered no injury."); In re Niaspan Antitrust Litig., 42 F. Supp. 3d 735, 758 (E.D. Pa. 2014).

Therefore, the Court will grant Defendants' Motions and dismiss Plaintiffs' multi-state specific claims to the extent they are brought on behalf of putative class members outside of the six states represented by named Plaintiffs—New Jersey, California, Florida, Kansas, New York, and North Carolina—without prejudice.

Plaintiffs also assert three nationwide claims, which Defendants similarly claim they lack standing to bring before the Court. Plaintiffs nationwide claims for unjust enrichment and fraudulent concealment are common law claims, and such claims rely on state law. For the same reasons as above, the Court finds that Plaintiffs lack standing to bring such claims on a national basis.[9] Notwithstanding, Plaintiffs bring both claims, alternatively, under their respective home states' law. The Court will, therefore, allow Nationwide Count I and Count II to proceed as to named Plaintiffs under each of their respective states' law.

Nationwide Count III alleges violations of the Magnuson-Moss Warranty Act, 15 U.S.C. §2301, et seq. ("MMWA"). The MMWA provides that "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief." 15 U.S.C.A. § 2310. District courts have found that a plaintiff in federal court is not precluded from asserting federal claims on behalf of a nationwide class. Hickman v. TL Transp., LLC, 317 F. Supp. 3d 890, 899 n.2 (E.D. Pa. 2018). Although claims brought under the MMWA are federal claims, they rely on the underlying state law claims brought by plaintiffs. See Johansson v. Cent. Garden & Pet Co., 804 F. Supp. 2d 257, 265 (D.N.J.

---

[9] See In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig., 336 F. Supp. 3d 1256, 1345 (D. Kan. 2018) (dismissing plaintiff's unjust enrichment claims under laws of states where no named plaintiffs resided); In re: Lamictal Indirect Purchaser & Antitrust Consumer Litig., 172 F. Supp. 3d 724, 754 (D.N.J. 2016) (holding named plaintiffs accountable for satisfying jurisdiction and finding they did not have standing to bring "unjust enrichment claims under the laws of any 'states and territories of the United States' other than [those states in which they were harmed]." (quoting Neale, 794 F.3d at 364));

2011). Therefore, Plaintiffs' nationwide claim under the MMWA will be dismissed for lack of standing.[10]

<h2 style="text-align:center;">V. <u>Motion to Dismiss for Failure to State a Claim</u></h2>

**A. Failure to State a Claim under Fed. R. of Civ. Pro. 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for dismissal of a claim based on "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A complaint should be dismissed pursuant to Rule 12(b)(6) if the alleged facts, taken as true, fail to state a claim. Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss pursuant to Rule 12(b)(6), ordinarily only the allegations in the complaint, matters of public record, orders, and exhibits attached to the complaint, are taken into consideration.[1] <u>See</u> <u>Chester County Intermediate Unit v. Pa. Blue Shield</u>, 896 F.2d 808, 812 (3d Cir. 1990). It is not necessary for the plaintiff to plead evidence. <u>Bogosian v. Gulf Oil Corp.</u>, 561 F.2d 434, 446 (3d Cir. 1977). The question before the Court is not whether the plaintiff will ultimately prevail. <u>Watson v. Abington Twp.</u>, 478 F.3d 144, 150 (2007). Instead, the Court simply asks whether the plaintiff has articulated "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).

---

[10] Even if Plaintiffs' were permitted, at this stage, to assert a nationwide claim for violations of the MMWA, that claim would be dismissed on independent grounds pursuant to Rule 12(b)(6). Specifically, for the reasons stated <u>infra</u> Part V., Plaintiffs' breach of warranty claims will be dismissed—the breach of express warranty claims fail to state a plausible claim for relief, and Plaintiffs voluntarily withdrew claims for breach of implied warranty. Accordingly, Plaintiffs could not sustain a MMWA claim against Defendants.

[1] "Although a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." <u>U.S. Express Lines, Ltd. v. Higgins</u>, 281 F.3d 383, 388 (3d Cir. 2002) (internal quotation marks and citations omitted) (emphasis deleted). <u>Accord</u> <u>Lum v. Bank of Am.</u>, 361 F.3d 217, 221 n.3 (3d Cir. 2004) (citations omitted).

"A claim has facial plausibility[2] when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). "Where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679.

The Court need not accept "'unsupported conclusions and unwarranted inferences,'" Baraka v. McGreevey, 481 F.3d 187, 195 (3d Cir. 2007) (citation omitted), however, and "[l]egal conclusions made in the guise of factual allegations . . . are given no presumption of truthfulness." Wyeth v. Ranbaxy Labs., Ltd., 448 F. Supp. 2d 607, 609 (D.N.J. 2006) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)); see also Kanter v. Barella, 489 F.3d 170, 177 (3d Cir. 2007) (quoting Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005) ("[A] court need not credit either 'bald assertions' or 'legal conclusions' in a complaint when deciding a motion to dismiss.")). Accord Iqbal, 556 U.S. at 678-80 (finding that pleadings that are no more than conclusions are not entitled to the assumption of truth).

Further, although "detailed factual allegations" are not necessary, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." Twombly, 550 U.S. at 555 (internal citations omitted). See also Iqbal, 556 U.S. at 678

---

[2]This plausibility standard requires more than a mere possibility that unlawful conduct has occurred. "When a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" Id.

("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Thus, a motion to dismiss should be granted unless the plaintiff's factual allegations are "enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true (even if doubtful in fact)." Twombly, 550 U.S. at 556 (internal citations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'shown'-'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

### B. Plaintiffs' Fraud Based Claims

Defendants extensively argue that Plaintiffs fraud based claims should be dismissed pursuant to Rule 12(b)(6). They submit the following general arguments to be addressed: (1) Plaintiffs have impermissibly engaged in group pleading; (2) Plaintiffs fraudulent concealment claim fails because Plaintiffs allege no facts showing MBUSA violated a duty to disclose; (3) Plaintiffs state consumer fraud claims should be dismissed for failure to plead alleged omissions and misrepresentations adequately under Rule 9(b). Defendants additionally argue that Plaintiffs fraud based claims further fail for state law specific reasons. The Court will address those particular arguments as needed.

### 1. Rule 9(b) Pleading

"A pleading of fraud is subject to heightened specificity requirements." MDNet, Inc. v. Pharmacia Corp., 147 F. App'x 239, 245 (3d Cir. 2005). Rule 9(b) requires that plaintiff plead the details of the alleged "circumstances" of the fraud with specificity sufficient to "place defendants on notice of the precise misconduct with which they are

charged." <u>Seville Indus. Mach. Corp. v. Southmost Mach. Corp.</u>, 742 F.2d 786, 791 (3d Cir. 1984). To that end, "[a]lthough the rule states that [m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally, and does not require the plaintiff to plead every material detail of the fraud, the plaintiff must use alternative means of injecting precision and some measure of substantiation into their allegations of fraud." <u>Argabright v. Rheem Mfg. Co.</u>, 201 F. Supp. 3d 578, 590–91 (D.N.J. 2016) (quoting <u>In re Rockefeller Ctr. Props., Inc. Sec. Litig.</u>, 311 F.3d 198, 216 (3d Cir. 2002) (internal quotations and citations omitted)). At a minimum, a plaintiff "must allege who made a misrepresentation to whom and the general content of the misrepresentation." <u>Lum v. Bank of Am.</u>, 361 F.3d 217, 224 (3d Cir. 2004).

### 2. *Group pleading*

In their Complaint, Plaintiffs refer to MBUSA and Daimler together, as "Defendants" or "Mercedes." At the outset, Defendants contend that Plaintiffs have, therefore, failed to properly plead claims specifically against MBUSA and Daimler by failing to differentiate between the two defendants. They argue that such failure warrants dismissal of Plaintiffs' fraud claims alone. [Dkt. No. 22 at 19].

In cases, such as the present, "[w]hen multiple defendants are involved, the complaint must plead with particularity by specifying the allegations of fraud applying to each defendant." <u>MDNet, Inc. v. Pharmacia Corp.</u>, 147 F. App'x 239, 245 (3d Cir. 2005) (citing <u>Cinalli v. Kane</u>, 191 F. Supp. 2d 601, 609 (E.D. Pa. 2002)). "Rule 9(b) does not allow a complaint to merely lump multiple defendants together." <u>Swartz v. KPMG LLP</u>, 476 F.3d 756, 764 (9th Cir. 2007). However, this is also a case dealing with "an alleged fraudulent concealment perpetrated by sophisticated corporate entities that are related to each other, [in which a] [p]laintiff need not distinguish the specific roles that

each entity played in the fraudulent concealment in order to meet the Rule 9(b) standard." <u>Gray v. BMW of N. Am., LLC</u>, 2014 WL 4723161, at *2 (D.N.J. Sept. 23, 2014). In fact, "Plaintiffs cannot be expected to know the exact . . . degree of each Defendant's involvement, at this stage in the litigation and prior to discovery." <u>In re Volkswagen Timing Chain Prod. Liab. Litig.</u>, 2017 WL 1902160, at *9 (D.N.J. May 8, 2017); <u>Yu-Chin Chang v. Upright Fin. Corp.</u>, No. 19CV18414, 2020 WL 473649, at *3 (D.N.J. Jan. 28, 2020) ("The precise relation between the two defendants is not a fact in control of the plaintiffs, but can easily be explored in discovery.").

Here, Plaintiffs emphasize that they "assert common allegations against MBUSA and Daimler because they are joined through the same corporate structure and act as agents and/or alter egos of each other." [Dkt. No. 27 (citing Compl. ¶¶ 75-76)]. Additionally, under the circumstances of this case, referring to Defendants as one is not problematic as "[t]hese are not two defendants who performed different acts, and are left in the dark about who did which." <u>Yu-Chin Chang</u>, 2020 WL 473649, at *3. In light of the foregoing, Plaintiffs' Complaint sufficiently puts Defendants on notice to suffice pleading requirements. Therefore, the Court will deny Defendants' Motions to Dismiss for "group pleading."

### 3. COUNT I: Fraudulent Concealment

In Count I of Plaintiffs' Complaint, Plaintiffs allege that "Mercedes fraudulently concealed and suppressed material facts concerning the quality of the Class Vehicles," their Mars Red paint, and the existence of the Paint Defect. (Compl. ¶ 202). They assert that Mercedes knew that Mars Red paint suffered from a defect, failed to disclose that defect to consumers, and "knowingly and intentionally engaged in this concealment in

order to boost sales and revenue, maintain its competitive edge in the automobile market, and obtain windfall profit." (Id. at ¶¶ 203-6).

The elements of a fraudulent concealment claim are similar under all six states' law. Generally, to state a claim for fraudulent concealment "a plaintiff must allege: (1) a legal duty to disclose (2) a material fact (3) that plaintiff could not discover without defendant disclosing it; (4) that defendant intentionally failed to disclose that fact; and (5) that plaintiff was harmed by relying on the non-disclosure." Polhill v. FedEx Ground Package Sys., 604 F. App'x 104, 108 n.2 (3d Cir. 2015) (citing Rosenblit v. Zimmerman, 766 A.2d 749, 757 (N.J. 2001)); see also Zetz v. Bos. Sci. Corp., 398 F. Supp. 3d 700, 712 (E.D. Cal. 2019); Koski v. Carrier Corp., 347 F. Supp. 3d 1185, 1196 (S.D. Fla. 2017); De Sole v. Knoedler Gallery, LLC, 974 F. Supp. 2d 274, 314 (S.D.N.Y. 2013); Kestrel Holdings I, L.L.C. v. Learjet Inc., 316 F. Supp. 2d 1071, 1078 (D. Kan. 2004); Friedland v. Gales, 509 S.E.2d 793, 797 (N.C. Ct. App. 1998).

According to Defendants, "Plaintiffs' claims for fraudulent concealment must be dismissed because they do not plead facts showing—as they must—that MBUSA had a duty to disclose the alleged defect." [Dkt. No. 22 at 21]. The parties do not dispute that the duty to disclose is a necessary element of Count II. [Dkt. No. 27 at 20]. According to Plaintiffs, however, both Defendants had a duty to disclose the Paint Defect because: (1) they had exclusive/superior knowledge of the Paint Defect and concealment; (2) only Mercedes could know of or obtain the facts concerning the Paint Defect and concealment thereof; (3) they "knew that Plaintiffs and Class members did not know about, or could not reasonably discover, the Paint Defect and concealment"; and (4) their numerous representations and assurances about the qualities of the Class Vehicles,

were misleading, deceptive, and incomplete without the disclosure of the Paint Defect. (Compl. ¶ 207).

a. <u>Knowledge</u>

Defendants mainly contend that Plaintiffs have not alleged facts supporting a duty to disclose—warranting dismissal of Count II entirely—because the Complaint fails to show Defendants' presale knowledge of the alleged Paint Defect. [Dkt. No. 22].

The Complaint provides that Defendants had presale knowledge of the Paint Defect pursuant to (1) pre-release design and testing; (2) technical service bulletin; (3) consumer complaints; and (4) warranty and paint replacement data. Defendants addresses each point in turn, arguing that the allegations contained in the Complaint are inadequate to show knowledge. The Court disagrees, and finds that the totality of allegations pertaining to Defendants' knowledge of the alleged defect, collectively, are sufficient to establish Defendants' had presale knowledge of the Paint Defect.

First, Plaintiffs' allegations concerning pre-release design and testing is sufficient to support a conclusion that Defendants had knowledge of the alleged Paint Defect. In their Complaint, Plaintiffs detail a number of test procedures that allegedly test the paint on its vehicles. Plaintiffs provide test procedures developed by the American Society for Testing and Materials ("ASTM") and the Society of Automotive Engineers ("SAE"). (Compl. at ¶¶ 125-26). Next, they allege, on information and belief, that the Defendants, through membership of Production Part Approval Process ("PPAP"), would have been required "to test the paint, and its application, to see how it performed in simulated real-world conditions to determine the quality and durability of the paint, whether the paint adhered to the surface of the vehicle, whether it corroded or delaminated . . . whether the color or gloss faded, changed, or was retained . . . ." (<u>Id.</u> ¶

131). The Complaint explains what PPAP is, its purpose, and requirements. (Id. at ¶¶ 127-31). Finally, Plaintiffs allege that Mercedes further developed "Mercedes SAE Standards & Testing" which are "used in connection with the testing of its vehicle, including . . . a test relating to the 'Coating/Painting for Parts Subject to Moderate Exposure to Corrosion Stress,'" and other various tests concerning the performance of the paint used on its vehicles. (Id. at ¶ 134). Together, Plaintiffs allege Defendants' employed testing that would have revealed the Paint Defect. (Id. at ¶ 135).

Defendants attempt to discredit Plaintiffs' testing allegations by arguing that they "do not allege any facts showing that the supposed pre-production testing and design results were unsatisfactory or that they revealed the alleged defect." [Dkt. No. 22 at 22]. This argument ignores the fact that "Courts must be sensitive to the fact that application of Rule 9(b) prior to discovery 'may permit sophisticated defrauders to successfully conceal the details of their fraud.'" Craftmatic Securities Litigation v. Kraftsow, 890 F.2d 628, 645 (3d Cir. 1989) (quoting Christidis v. First Pennsylvania Mortg. Tr., 717 F.2d 96, 99–100 (3d Cir. 1983)). Hence, "[k]nowledge [is] exempt from Rule 9(b)'s particularity requirement, so long as the circumstances surrounding such general allegations of knowledge suffice to infer what defendant is alleged to have known and when." BK Trucking Co. v. Paccar, Inc., 2016 WL 3566723, at *8 (D.N.J. June 30, 2016). Here, Plaintiffs allege that "details regarding the testing performed by Mercedes and the results of that testing are in the exclusive custody and control of Mercedes." (Compl. ¶ 135).

Defendants cite to a number of California cases for the proposition that Plaintiffs allegations are merely conclusory and therefore, would impermissibly require the Court to infer the "opportunity to learn about" the alleged defect. [Dkt. No. 22 at 23]. They

contend that "inferring knowledge of a defect from 'internal testing or quality controls [that the defendant] may or may not employ is to create a presumption of knowledge on the part of any large manufacturer of any alleged defect in its product line.'" (Id. (citing Stewart v. Electrolux Home Prods., 2018 U.S. Dist. LEXIS 63078, at *27-*29 (E.D. Cal. Apr. 13, 2018)). The allegations in the present case, however, suffice to infer that Mercedes knew of the alleged defect in paint from pre-sale testing of that paint. At this stage, the factual allegations are more than speculative. The Complaint alleges more than "an assumption the manufacturer monitored product performance after-market." Id. at *9. Plaintiffs explicitly allege that "Mercedes engaged in at least four years of development and testing prior to utilizing the new type of clearcoat paint on the Class Vehicles. This included abrasion tests in a laboratory car-wash and extensive testing on the nanoparticle clearcoat in both laboratory and everyday conditions." (Compl. ¶ 132) (emphasis added).

The Complaint here, is also distinguishable from additional cases relied on by Defendants, as it provides enough facts to infer that the defect complained of would have arose in the testing processes Mercedes allegedly conducts. Cf., Resnick v. Hyundai Motor Am., Inc., No. CV1600593, 2016 WL 9455016, at *13 (C.D. Cal. Nov. 14, 2016) (finding allegations of defendants' presale knowledge of product defect based on testing was insufficient where plaintiffs allegations were purely speculative and failed to establish when any testing occurred, stating that defendant "likely" performed testing); Burdt v. Whirlpool Corp., 2015 U.S. Dist. LEXIS 102761, at *12 (N.D. Cal. Aug. 5, 2015) ("Plaintiff must allege more than an undetailed assertion that the testing must have revealed the alleged defect. Otherwise, any consumer could bring a CLRA claim merely by asserting that a manufacturer had knowledge of an alleged defect from its pre-release

testing."). Unlike cases where allegations were speculative, here Plaintiffs extensively details the testing, on paint, that "would have" revealed the Paint Defect, rather than simply alleging certain testing "must have" revealed a defect.

The Court also agrees with Plaintiffs that, "[t]he TSBs further support Plaintiffs' 'allegations that [MBUSA] engaged in testing or otherwise learned of the Defect through internal sources.'" [Dkt. No. 27 at 14 (citing <u>Majdipour v. Jaguar Land Rover N. Am.</u>, LLC, 2013 WL 5574626, at *18 (D.N.J. Oct. 9, 2013)]. Based on the Complaint, "[a]t some time prior to June 12, 2014, Daimler issued the initial version of TSB 'LI98.00-P-058914' to MBUSA's dealers. . . . On June 12, 2014, Mercedes issued the second version of TSB 'LI98.00-P-058914,' titled, 'Clearcoat peeling / flaking / bubbling,' which applied to '[a]ll vehicles with 590 – Mars Red' paint." (Compl. ¶ 137-38). The TSB identified the reason for its issuance to Mercedes dealers, the symptoms of the defect, and potential causes. (<u>Id.</u> at ¶ 139-40). Plaintiffs allege that "numerous versions of the TSB" have since been issued, and updated damage codes for dealers. (<u>Id.</u> at 141-43).

Courts may be "hesitant to view technical service bulletins . . . as potential admissions of fraudulent concealment of a defect." <u>Alban v. BMW of North America</u>, LLC, 2011 U.S. Dist. LEXIS 26754, at *36-*37 (D.N.J. March 15, 2011); <u>Am. Honda v. Super. Ct.</u>, 132 Cal. Rptr. 3d 91, 100 (Cal. Ct. App. 2011) ("A TSB is not and cannot be fairly construed . . . as an admission of a design or other defect."). Defendants contend, therefore, that the TSB is insufficient to impose liability. They further submit that the TSBs at issue identified certain environmental factors as potential causes and "cannot plausibly be construed—contrary to its own language—as an admission of a defect."

At this juncture, the Court is not determining liability or considering the TSB as an "admission" of any kind. Rather, the various "TSB helps render plausible Plaintiffs'

allegations that Defendants knew" of the alleged defect. <u>Skeen v. BMW of N. Am., LLC</u>, No. 2:13-CV-1531, 2014 WL 283628, at *10 (D.N.J. Jan. 24, 2014). Indeed, this TSB address the exact problem with Mars Red Paint that Plaintiffs' take issue with. <u>See</u> <u>MacDonald v. Ford Motor Co.</u>, No. CV 13-02988, 2014 WL 1340339, *4 (N.D. Cal. Mar. 31, 2014) ("One plausible inference that can be drawn from the three TSBs is that Ford was generally aware of problems with the coolant pump, and that despite this awareness it continued to sell vehicles containing the defective part. For instance, the second TSB indicates that Ford was aware of defects in July 2008. That plausibly suggests that it was aware of some of those same defects when Plaintiff Barbee purchased his vehicle five months earlier."); <u>Kommer v. Ford Motor Co.</u>, No. 117CV0296, 2018 WL 3727353, at *3 (N.D.N.Y. Aug. 6, 2018) (finding that an defendant's TSB created a plausible inference it knew of the defects at issue in plaintiff's vehicle (citing <u>Majdipour</u>, 2013 WL 5574626, at *18 )). Furthermore, the TSBs are considered <u>in conjunction</u> with the other allegations of pre-sale knowledge, which together, permits the Court infer that Defendants recognized what Plaintiffs' deem of the "Paint Defect." <u>See</u> <u>Am. Honda</u>, 132 Cal. Rptr. 3d at 100.

Similarly, Plaintiffs allegations pertaining to consumer complaints should be considered together with the rest of allegations of presale knowledge. Here, Plaintiffs allege that Defendants knew of the Paint Defect because of consumer complaints made directly to Mercedes. According to the Complaint, "many Class Vehicles owners complained directly to Mercedes and Mercedes authorized dealerships about the peeling, flaking, and bubbling of the clearcoat their vehicles experienced." (Compl. ¶ 152). Defendants' rely on a number of cases in arguing that consumer complaints are insufficient to show knowledge of a defect. Those cases are distinguishable.

For example, in <u>Berenblat v. Apple, Inc.</u>, the California district court found consumer complaints "posted on Apple's consumer website merely establish[ed] the fact that some consumers were complaining." No. 08-4969, 2010 WL 1460297, at *9 (N.D. Cal. Apr. 9, 2010). That court, however, held that the complaints were insufficient to establish knowledge, <u>by themselves</u>. <u>Id.</u> Here, Plaintiffs do not rely solely on consumer complaints to establish Defendants' knowledge. Additionally, the plaintiffs' allegation in <u>Wilson v. Hewlett-Packard Co.</u> provided a weaker basis for establishing knowledge than Plaintiffs in this case. In <u>Wilson</u>, plaintiffs allegations were "merely conclusory" as they generally claimed that the defendant "'became familiar with' and was 'on notice' of the defect plaguing the [product] at the time of manufacture." 668 F.3d 1136, 1146–47 (9th Cir. 2012). Unlike here, plaintiffs failed to "indicate where or how the complaints were made." <u>Id.</u> at 1448. Instead, the complaint simply asserted that the defendant had "access to the aggregate information and data regarding the risk of overheating." <u>Id.</u> at 1146.

In contrast, Plaintiffs allegations here are, again, more than speculative, as they assert where and when consumer complaints were made and facts to suggest tests and other information "could have alerted [MBUSA and Daimler] to the defect." <u>See</u> <u>Id.</u> at 1147 (<u>see</u> <u>also</u> Compl. ¶ 152). Specifically, Plaintiffs provide examples of complaints made directly to Mercedes and complaints made on public forums, detailing their contents and further alleging that Defendants track the websites/forums where these complaints are found. (<u>Id.</u> ¶¶ 151-55).

Lastly, Plaintiffs' claim that Mercedes knew of the Paint Defect from warranty data and replacement paint orders. The allegations state that, "Mercedes collects, reviews, and analyzes detailed information about repairs made on vehicles still under

warranty at its dealerships and service centers, including the type and frequency of such repair" and that "Mercedes-authorized service centers use replacement parts that they order directly from Mercedes." (Id. at ¶¶ 140-50). Plaintiffs allege that Defendants "would have detailed and accurate data regarding the number and frequency of replacement part orders, including replacement Mars Red paint;" which Plaintiffs further allege would have included a "higher than expected" amount of replacements for Mars Red paint. (Id. at ¶¶ 147-50). Defendants stress that "no facts showing what data was contained in those databases, when MBUSA became aware of such, or how it shows the existence of the alleged paint defect." [Dkt. No. 22 at 27]. The Court agrees that, with respect to warranty and replacement data, Plaintiffs' Complaint falls short.

As discussed infra, most Plaintiffs fail to allege that the Paint Defect manifested itself inside their warranty period. In fact, most named Plaintiffs' Class Vehicles were outside warranty at the time they noticed their paint was bubbling/peeling. The Complaint further lacks any factual allegations supporting a "high" number of warranty claims or replacements, or when these alleged warranty claims would have occurred. See Williams v. Yamaha Motor Corp., U.S.A., 106 F. Supp. 3d 1101, 1116 (C.D. Cal. 2015), aff'd sub nom. 851 F.3d 1015 (9th Cir. 2017) ("Plaintiffs allege that the Paint Defect, often, does not reveal itself until after the warranty period. . . it is implausible to infer both that the defect took five to seven years to manifest for most ordinary customers—a notion supported by the fact that none of the twenty named Plaintiffs sought repairs during the warranty periods[]—and that "many" customers were submitting warranty claims as a result of this defect beginning in 2001." (citation omitted)).

Notwithstanding, Plaintiffs have sufficiently alleged that Defendants knew of the alleged defect prior to any of the named Plaintiffs' sales. In conjunction, the allegations

establish that Mercedes knew of the defect prior to sale through pre-sale testing and at least as of June 2014 (when Mercedes issued the TSB). The allegations further permit an inference that Mercedes knew of the defect even earlier—as "it takes between six months to more than one year (or longer) from the start of a defect investigation to the issuance of a TSB, such as the TSB issued here." (Compl. ¶ 146). Plaintiffs therefore allege that, "based on the second version of the TSB alone, Mercedes knew of the Paint Defect as early as June 2013 and no later than December 2013." (Compl. ¶ 146.)

Furthermore, the substance of the consumer complaints Plaintiffs' provide also support that Mercedes Customers reported the Paint Defect to Mercedes Dealerships as early as 2010 and have been complaining about the same Mars Red Paint issue prior to the sale of Plaintiffs' vehicles. Accordingly, the factual allegations in the Complaint support Plaintiffs allegation that "Mercedes has actively concealed the existence and nature of the Paint Defect from Class members since at least 2010." (Id. at ¶ 156). Therefore, it is inapposite that Plaintiffs Ponzio, Kloczko, and Salgado purchased Class Vehicles before the TSB was first issued on June 12, 2014, as alleged by Defendants.

To reiterate, Plaintiffs' factual allegations, taken together, "state sufficient factual matter, taken as true, to support a plausible inference that Defendant 'was aware of a defect at the time of sale.'" Grodzitsky v. Am. Honda Motor Co., No. 12-CV-1142, 2013 WL 2631326, at *6–7 (C.D. Cal. June 12, 2013) (finding that a complaint sufficiently alleged knowledge of defect on behalf of defendant, Honda, where plaintiffs alleged defendant was aware of the defect from: testing data the "would have" revealed the alleged defect, warranty data, high-number of replacement orders, and complaints made to Honda and public online forums); In re Volkswagen Timing Chain, 2017 WL 1902160, at *19 (finding plaintiff adequately alleged the defendant's superior knowledge

of the supposed defect under, *inter alia*, New York, California, Florida, Kansas, and North Carolina law upon alleging pre-production testing, consumer complaints, warranty data, and further testing based on complaints); <u>Majdipour</u>, 2013 WL 5574626, at *17 ("Plaintiffs' allegations concerning pre-release testing data, early consumer complaints about the Defect to Land Rover and their dealers, testing conducted in response to those complaints, high failure rates and replacement parts sales data contained in [Land Rover's] warranty databases, as well as high reimbursement claims paid to Land Rover dealers," and defendant's TSB "taken together, adequately plead [defendant]'s exclusive knowledge").

Of note, Defendants make no further arguments that Plaintiff Nelthrope's claim under New York law should be dismissed. Therefore, because the Court finds that Plaintiffs have sufficiently alleged Defendants presale knowledge, it will deny Defendants' Motions to Dismiss Count II as to Plaintiff Nelthrope. <u>See</u> <u>Abrams v. Gen. Motors Corp.</u>, 466 N.Y.S. 2d 124 (Sup. Ct. 1983) ( "If one party has superior knowledge or has means of knowledge not available to both parties, then he is under a legal obligation to speak and the silence would constitute fraud.").

    b.  <u>The Kansas, Florida, North Carolina, and New Jersey  Plaintiffs' Fraudulent Concealment Claims: Special Relationship</u>

Defendants next argue that the Kansas, Florida, New Jersey, and North Carolina Plaintiffs' fraudulent concealment claims fail because they do not allege facts showing a relationship between them and Defendants that would create a duty to disclose. Specifically, Defendants contend that they "did not owe the Kansas, Florida, New Jersey, or North Carolina plaintiffs any duty of disclosure because there was no fiduciary, contractual, or other confidential relationship between them." [Dkt. No. 22 at 29].

### i. North Carolina & Kansas

Both North Carolina and Kansas law provide that a duty to disclose arises "when a party has taken affirmative steps to conceal material facts from the other. . . . [and] where one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence." Harton v. Harton, 344 S.E.2d 117, 119 (N.C. Ct. App. 1986); Plastic Packaging Corp. v. Sun Chem. Corp., 136 F. Supp. 2d 1201, 1205 (D. Kan. 2001). However, courts in each state will not impose upon a party such a duty to disclose absent a contractual or other special relationship.

North Carolina courts have recognized "[a] duty to disclose in arm's length negotiations . . . where one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence." Harton, 344 S.E.2d 117, 119 (emphasis added). Here, North Carolina Plaintiff, Mr. Mull, did not deal in an arm's length transaction with Mercedes because Mull purchased his Class Vehicle from Jarmon Auto Sales, Inc. in Greenville, North Carolina. Plaintiff Mull fails to allege, therefore, that he purchased his Class Vehicle from an authorized Mercedes dealership and fails to allege, or even suggest, that Jarmon could be an agent of Mercedes. (Compl. ¶¶ 52-56). Moreover, Plaintiffs do not argue that any special relationship exists. Thus, the Court will dismiss the fraudulent concealment claim as to Plaintiff Mull under North Carolina law.

Under Kansas law "a contracting party who has superior knowledge, or knowledge that is not within the reasonable reach of the other party, has a legal duty to disclose information material to the bargain." Plastic Packaging Corp. v. Sun Chem. Corp., 136 F. Supp. 2d 1201, 1205 (D. Kan. 2001). In Kansas, "[w]hether or not a contractual or

fiduciary duty to disclose exists is determined by the facts and circumstances of each individual case." Plastic Packaging Corp. v. Sun Chem. Corp., 136 F. Supp. 2d 1201, 1205 (D. Kan. 2001).

Plaintiffs' argue that here, there is a duty based on defendants' "exclusive or superior knowledge" and because they concealed the omitted information. [Dkt. No. 27 at 20]. Plaintiffs interpretation of Kansas law, however, is too broad as it fails to recognize that a plaintiff must maintain a certain relationship with the defendant, who allegedly has superior knowledge, for a duty to arise. Kestrel Holdings I, L.L.C. v. Learjet Inc., 316 F. Supp. 2d 1071, 1078 (D. Kan. 2004) (quoting Plastic Packaging Corp, 136 F. Supp. 2d at 1205)(emphasis added)(second alteration in original); DuShane v. Union Nat'l Bank, 576 P.2d 674, 679 (Kan. 1978) (duty to disclose "between two contracting parties when there is a disparity of bargaining powers or of expertise," or "[i]f the parties to a bargain are in a fiduciary relationship to one another"). Additionally, duty to disclose based on "superior knowledge", under Kansas law, does not apply in the absence of a direct business transaction between a buyer and a seller. In re MI Windows & Doors, Inc. Prod. Liab. Litig., No. 2:12-CV-02860, 2013 WL 1442332, at *4 (D.S.C. Apr. 9, 2013) (interpreting Kansas law) (citing Great Plains Christian Radio, Inc. v. Cent. Tower, Inc., 399 F. Supp. 2d 1185, 1195 (D. Kan. 2005) and Stockinger v. Toyota Motor Sales USA Inc, No. LACV1700035, 2017 WL 10574372, at *17 (C.D. Cal. July 7, 2017)).

Here, Plaintiff Madsen has not alleged such a contractual relationship, nor any fiduciary relations to Defendants so as to permit a fraudulent concealment claim to survive a motion to dismiss. First, the "weight of core authority [ in Kansas] hold[s] that the relationship between a product buyer and seller is not fiduciary in nature." Burton v. R.J. Reynolds Tobacco Co., 397 F.3d 906, 912–13 (10th Cir. 2005). Additionally,

47

Plaintiff Madsen did not directly buy his Class Vehicle from Mercedes or any of its agents, he purchased his Class Vehicle from Overland Park Imports in Overland Park, Kansas. (Compl. ¶ 42).Therefore, absent a direct transaction between the parties, Plaintiff Madsen cannot establish Mercedes owed him a duty to disclose and thus, his claim under Count I fails.[11]

### ii. Florida

Under Florida law, "a duty to disclose arises 'when one party has information that the other party has the right to know because of the fiduciary or other relationship of trust or confidence between them' " <u>Temurian v. Piccolo</u>, No. 18-CV-62737, 2019 WL 1763022, at *6 (S.D. Fla. Apr. 22, 2019). Put another way, "the common thread running through each scenario which gives rise to a duty to speak is that both the plaintiff and the defendant must have been parties to a transaction or must have had some kind of preexisting fiduciary relationship." <u>In re Palm Beach Fin. Partners, L.P.</u>, 517 B.R. 310, 335 (Bankr. S.D. Fla. 2013).

Furthermore, where there is an arm's length transaction, the non-disclosure of material facts alone will not suffice as an "actionable misrepresentation unless some artifice or trick has been employed to prevent the represented from making further independent inquiry, though non-disclosure of material facts may be fraudulent where the other party does not have an equal opportunity to become appraised of the fact." <u>Taylor v. Am. Honda Motor Co.</u>, 555 F. Supp. 59, 64 (M.D. Fla. 1982).

---

[11] Defendants make a second argument that, under Kansas law, Plaintiff Mull is barred from bringing a fraudulent concealment claim pursuant to the state's economic loss rule. Because Plaintiff Mull's claim under Count I will be dismissed for failure to establish a duty to disclose the alleged defect, the Court will not address whether his claim is further barred by the Kansas economic loss doctrine.

Here, three Plaintiffs purchased their vehicles in Florida—Kloczko, Acuna, and Miller—however, only one Florida Plaintiff purchased a Class Vehicle from a Mercedes Dealership. No Plaintiffs allege that any fiduciary relationship between the parties exists.

Plaintiff Miller alleges that she purchased her Class Vehicle from Southeast Car Agency in Gainesville, Florida, and Plaintiff Acuna's Class Vehicle was purchased directly from Off Lease Only in Miami, Florida. (Compl. ¶¶ 26, 36). Accordingly, Miller and Acuna fail to allege facts showing that they were parties to a transaction with Mercedes Defendants. Therefore, without more, Miller and Acuna have failed to plead that Defendants owed them a duty to disclose to Paint Defect. The Court will dismiss the fraudulent concealment (Count I) under Florida law, as to these two Plaintiffs.

Plaintiff Kloczko, however, has presented a scenario which gives rise to a permissible inference the Defendants had a duty to disclose the alleged defect to Ms. Kloczko because she purchased her Class Vehicle from Mercedes-Benz of Miami, an authorized Mercedes-Benz dealer. Plaintiffs' pleadings include an allegations that Mercedes Dealers are agents of Defendants (Compl. ¶ 240). Therefore, Plaintiff Kloczko and Defendants were parties to a transaction. No other substantive element of Plaintiff Kloczko's claim for fraudulent concealment is at issue, and the Court has found that Plaintiffs have adequately pled Defendants presale knowledge of the alleged Paint Defect, and that Mercedes' knowledge was "exclusive or far superior." (Id. at ¶ 208 (a)). Defendants, however, further argue that a claim for fraudulent concealment under Florida law is barred by the economic loss doctrine. This argument, with regard to Plaintiff Kloczko is addressed below.

### iii. New Jersey

Defendants' initially argue that, like North Carolina, Kansas and Florida Plaintiffs, Plaintiff Ponzio's Fraudulent Concealment claim fails to establish a duty to disclose under New Jersey law for failure to plead a special relationship between the parties. A duty to disclose in New Jersey arises: (1) when there is a fiduciary relationship between the parties; (2) when one party expressly reposits trust in another party, or else from the circumstances, such trust necessarily is implied; and (3) when the relationship involving the transaction is 'so intrinsically fiduciary that a degree of trust and confidence is required to protect the parties.'" Argabright v. Rheem Mfg. Co., 201 F. Supp. 3d 578, 603 (D.N.J. 2016) (quoting Lightning Lube, Inc. v. Whitco Corp., 4. F.3d 1153, 1185 (3d Cir. 1993)).

Therefore, Defendants are correct that New Jersey law also requires the parties share a special relationship, and in fact, "New Jersey Courts have found no special relationship between individual consumers and automobile manufacturers that would impose a duty to disclose on the manufacturers." Coba v. Ford Motor Co., No. CIV. 12-1622, 2013 WL 244687, at *12 (D.N.J. Jan. 22, 2013). Defendants, however, disregard that Courts may also impose a duty to disclose where "necessary to make a previous statement true." Lightning Lube, 4 F.3d at 1185. Stated another way, "specific ambiguous partial disclosures or statements by [manufactures]" may impose a duty to disclose. Coba, 2013 WL 244687, at *12 (D.N.J. Jan. 22, 2013).

To that end, Plaintiffs argue that Defendants', through marketing materials and commercials, "gave an 'incomplete picture' of the quality and durability of its paint that influenced Plaintiffs' purchasing decisions, knew that Plaintiffs were operating under a mistaken perception, and was, therefore, under a duty to correct its prior disclosures

upon which Plaintiffs relied." [Dkt. No. 27 at 22]. In response, Defendants argue that no duty to disclose arises here to "make a previous statement true,' because the statements plaintiffs put at issue are puffery and cannot give rise to a duty to disclose." [Dkt. No. 35 at 7].

"Advertising that amounts to 'mere' puffery is not actionable because no reasonable consumer relies on puffery. The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions." In re Toshiba America HD DVD Marketing and Sales Practices Litigation, 2009 WL 2940081, at *10 (D.N.J.,2009) (quoting Haskell v. Time, Inc., 857 F. Supp. 1392, 1399 (E.D. Cal. 1994)). In deciding whether a statement is puffery or something more, courts have looked to whether the statements would "victimize the average consumer." Turf Lawnmower Repair, 655 A.2d 417, 430 (N.J. 1995). Further, "vague and ill-defined opinions" cannot be construed as a misrepresentation. Bubbles N' Bows, 2207 WL 240698, at *9. Specifically, vague statements about "integrity" are mere puffery and cannot be construed as promises. Id.

Here, Plaintiffs rely on a variety of statements they allege Mercedes made in connection with their advertising and marketing schemes. They contend that Defendants rely only on a few "cherry-picked statements" to support their argument that the alleged representations are mere puffery. In particular, Defendants claim that statements like "Mercedes-Benz vehicles are "state-of-the-art" and have "enduring quality" and "the best possible paint job," (Compl. ¶¶ 103, 114), are non-actionable opinions. The Court agrees. See Tatum v. Chrysler Grp. LLC., No. 10-CV-4269, 2011 WL 1253847, at *4 (D.N.J. Mar. 28, 2011) (discussing two New Jersey cases, which found statements that "Ford's E350 van 'is a very safe vehicle,' and is 'America's Most

Trustworthy' constitute[ed] 'classic examples of non-actionable opinion,'" in concluding that Chrysler's ads for a "reliable" and "durable" vehicle were puffery); <u>Resnick</u>, 2016 U.S. Dist. LEXIS 160179, at *29 ("the Court finds that Defendants' representations that its paint process was 'state-of-the art' and 'will stand the test of time' were mere puffery.")

Plaintiffs do not necessarily contest that these statements are puffery, rather they emphasize other "partial representations" about the durability and quality of the paint and paint process used on the Class Vehicles which they submit are actionable [Dkt. No. 27 at 10]. For example, the Complaint contains factual allegations that:

- Mercedes represents that its vehicles are "manufactured with one of the most advanced paint finishes in the automotive industry. Scratch Resistant Clearcoat (SRC) uses 'nano-paint technology' comprised of microscopic ceramic particles that make it extremely durable and remarkably protective of the color coat beneath. This is particularly beneficial in protecting against swirl marks, minor scratches and even many chemical contaminants. (Compl.¶ 112).

- Mercedes-Benz uses computer-controlled automatic robots which ensure an [sic] uniformly high paint finish standard . . . .A quality standard has been achieved which gives vehicles greater luster and longer protection than ever before. (<u>Id.</u> at ¶ 113).

- New synthetic resin and two component polyurethane paints are considerably more resistant than cellulose paints (<u>Id.</u>).

- The purpose of the clear coat is to protect the color from damage due to the outside elements and UV damage. Topcoat is a new type of clear coat called Nano Clear Coat. It has a high cross-linking density which will provide a higher gloss and less [sic] scratches (<u>Id.</u> at ¶ 97).

The Court agrees with Plaintiffs, such statements are not puffery. Instead, they represent verifiable facts about the "protection," "finishes," and "density," of Mercedes paint and the "nano-paint technology" used in its making. These representation go beyond Mercedes own opinion of the mere integrity of the paint. To the contrary, these

representations demonstrate detailed statements that would plausibly "victimize the average consumer."

Defendants argue that, even if such statements are actionable, they are inapposite and do not save Plaintiff Ponzio's claim because Plaintiffs do not rely on these representations as the basis for their fraud claim. The Court disagrees. Plaintiffs specifically allege that they relied on representations that "touted the enduring quality, durability, and value of Mercedes' vehicles, including the Class Vehicle"—in purchasing their Class Vehicles, which they now claim were false and misleading. (Compl. ¶¶ 15, 211). The actionable statements made by Defendants pertain to the quality and durability, albeit indirectly, of its paint. Detailed Statements about how Mercedes paint is made and applied to Class Vehicles, under the particular circumstances, provide a high standard for the paint Mercedes affords—the very issue Plaintiffs take with its Mars Red. Therefore, these allegedly ambiguous partial disclosures or statements by Defendants may impose a duty to disclose the alleged defect with their paint and permits Plaintiff Ponzio's Count I claim to proceed under New Jersey law.

    c.  <u>Economic loss doctrine: California, Florida, and Kansas</u>

Defendants next argue that the economic loss doctrine bars Plaintiffs from California and Florida from bringing a fraudulent concealment claim. The Court agrees.

Under California law, the economic loss doctrine provides that, "[g]enerally, purely economic losses are not recoverable in tort." <u>NuCal Foods, Inc. v. Quality Egg LLC</u>, 918 F. Supp. 2d 1023, 1028 (E.D. Cal. 2013). It follows that, "where a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only economic losses." <u>Robinson Helicopter, Co., Inc. v. Dana Corp.</u>, 34 Cal. 4th 979, 988 (2004).

Therefore, the economic loss rule may preclude plaintiffs from recovering under fraud and other intentional tort theories of liability where the tort claims are based on the same facts as the breach of contract claims. <u>WeBoost Media S.R.L. v. LookSmart Ltd.</u>, No. C 13-5304, 2014 WL 2621465, at *5 (N.D. Cal. June 12, 2014) (dismissing a plaintiff's fraudulent concealment claim pursuant to the economic loss rule where plaintiff's breach of contract claim and fraud claim were exactly the same, "but with the addition of fraudulent intent and concealment").

The Supreme Court of California, in <u>Robinson Helicopter, Co., Inc. v. Dana Corp.</u>, explained that the economic loss rule will not apply where "[c]onduct amounting to a breach of contract . . . also violates a duty independent of the contract arising from principles of tort law." 102 P.3d 268, 274 (Cal. 2004). Plaintiffs allege that this exception applies to the present case, arguing that Montgomery's and Salgado's fraud claims "are based on an independent duty not to mislead or defraud consumers." [Dkt. No. 27 at 23]. The Court disagrees.

The <u>Robinson</u> exception is narrow; while the court permitted plaintiff's fraudulent inducement claim under the exception, "its holding does not apply to every fraud claim between contracting parties." <u>Alexsam v. Green Dot Corp.</u>, 2017 WL 2468769, at *5 (C.D. Cal. June 5, 2017); <u>Marshall v. Galvanoni</u>, No. 2:17-cv-00820, 2017 U.S. Dist. LEXIS 185530, at *14-15 (E.D. Cal. Nov. 7, 2017). In fact, the <u>Robinson</u> Court stated that its "holding . . . [is] limited to a defendant's affirmative misrepresentations on which a plaintiff relies, and which expose a plaintiff to liability for personal damages independent of the plaintiff's economic loss." Accordingly, "[t]o benefit from the exception, the tortious claim must allege an affirmative misrepresentation distinct from

the contract breach, and the claim must allege damages beyond what the contract breach caused." Marshall, 2017 U.S. Dist. LEXIS 185530, at *14-15.

With these principles in mind, the Court finds that California Plaintiffs' fraudulent concealment claim does not fall under the Robinson Exception and is barred by the California economic loss doctrine. Robinson involved allegedly defective helicopter safety clutches. The Plaintiff, Robinson, was a helicopter manufacturer who sued defendant, the manufacturer of the faulty clutches, after it was required to recall the clutches for failing at a higher rate. There, the defendant altered its manufacture of the clutches without notifying plaintiff and instead, made affirmative misrepresentations by providing false certificates of conformance. Robinson, 102 P.3d 270–71. Though there was no injuries or property damage resulting from the defect, the Robinson Court found defendant's misrepresentation exposed the plaintiff to potential "liability for personal damages independent of any economic loss contemplated under the contract." Stewart v. Electrolux Home Prod., Inc., 304 F. Supp. 3d 894, 904 (E.D. Cal. 2018) (citing Id. at 276)).

Here, Plaintiffs fraud claim is based on Defendants' alleged omissions. (Compl. ¶¶ 202-12). They claim that MBUSA and Daimler intentionally concealed material information only defendants knew from Plaintiffs and class members. As a result, Plaintiffs claim damages are for pure economic loss consisting of "damages for inadequate value, costs of repair and replacement of the defective product or consequent loss of profits—without any claim of personal injury or damages to other property." Robinson Helicopter, 102 P.3d 268, 272 (internal quotation marks omitted). Specifically, Count I alleges that "as direct and proximate result of Mercedes' deceit and fraudulent concealment . . . . [t]hey purchased and leased Class Vehicles that had a

diminished value by reason of Mercedes' concealment of, and failure to disclose, the Paint Defect. Plaintiffs and Class members also paid substantial money to (unsuccessfully) repair the Paint Defect." Plaintiffs claim the very same injury as a result of Defendants' alleged breach of warranty. Moreover, here, the alleged concealment does not expose Plaintiffs to any potential personal liability.

Therefore, "Plaintiffs have not alleged 'damages independent of [their] economic loss,' rendering the <u>Robinson</u> exception inapplicable here." <u>Traba v. Ford Motor Co.</u>, No. 218CV00808SVWGJS, 2018 WL 6038302, at *4 (C.D. Cal. June 27, 2018) (quoting <u>Robinson</u>, 34 Cal. 4th at 993.) (holding that the <u>Robinson</u> exception did not apply to plaintiff's fraudulent concealment where plaintiffs' sought damages for an allegedly defective vehicle finding their fraud damages were not independent of their economic loss); <u>see also</u> <u>Stewart</u>, 304 F. Supp. 3d at 902 (dismissing plaintiffs' fraudulent concealment claim as barred by the economic loss doctrine). Even taking into consideration that, to an extent, Plaintiffs allege defendants also made affirmative misrepresentations, simply put, plaintiffs fail to plead "harm above and beyond a broken contractual promise." <u>Robinson Helicopter</u>, 102 P.3d at 272.[12] Thus, the Court will dismiss Count I as to California Plaintiffs.

---

[12] Defendants further argue that Plaintiffs Montgomery and Salgado's claim for fraudulent concealment under California law fails because "they have not pled facts showing that the alleged paint defect presents an unreasonable safety hazard." [Dkt No. 22 at 26]. Whether an unreasonable safety hazard is <u>always</u> required to state a claim under California fraudulent concealment law is an unresolved issue. <u>Hodsdon v. Mars, Inc.</u>, 891 F.3d 857, 864 (9th Cir. 2018) ("The recent California cases show that *Wilson*'s safety hazard pleading requirement is not necessary in *all* omission cases, but that the requirement may remain applicable in some circumstances."). Because the Court will dismiss California named Plaintiffs' Count I pursuant to the economic loss rule, it declines to address Defendants argument.

The Florida economic loss doctrine also "precludes recovery on tort claims where there is no 'property damage or personal injury.' <u>Benkle v. Ford Motor Co.</u>, No. SACV161569, 2017 WL 9486154, at *9 (C.D. Cal. Dec. 22, 2017) (quoting <u>Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Companies, Inc.</u>, 110 So. 3d 399, 404 (Fla. 2013)). Pursuant to this doctrine, Plaintiff Kloczko's fraudulent concealment claim also fails.

Plaintiff contends that, in Florida, "the economic loss doctrine is inapplicable to claims based on a duty independent of any contract – i.e., a statutory duty, a duty not to fraudulently induce another to enter a contract, and a duty to disclose." [Dkt. No. 27 at 23 (citing <u>Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Companies, Inc.</u>, 110 So. 3d 399, 404 (Fla. 2013)]. The Southern District Court for the District of Florida specifically addressed the issue of whether "the Florida's Supreme Court, by its dicta [in <u>Tiara</u>], intended to abridge the economic loss rule in the products liability setting to allow fraudulent inducement and negligent misrepresentation claims (and by implication fraudulent concealment claims), even where the action for fraud depends upon precisely the same allegations as a warranty claim—i.e., a claim the product failed to work as promised." <u>In re Takata Airbag Prod. Liab. Litig.</u>, 193 F. Supp. 3d 1324, 1338–39 (S.D. Fla. 2016). The Florida court found that it did not so intend and therefore, held that the plaintiff's fraudulent concealment claim currently before the court failed because "[those] claims allege precisely what a breach of warranty claim would allege—namely that the [defendant's] vehicles did not work as promised." <u>Id.</u> at 1339.

Similar to the facts presented in <u>In re Takata Airbag Prod</u>, here, Plaintiffs allege a purely economic loss as a result of the alleged defect on the same basis that they allege Mercedes breached its warranty—that their Mercedes Mars Red paint fails to function as promised. Therefore, the Court will dismiss Plaintiff Kloczko's fraudulent concealment

claim.  See Cardenas v. Toyota Motor Corp., No. 18-22798, 2019 WL 4777891, at *7 (S.D. Fla. Sept. 30, 2019) (finding plaintiff's fraud claim was barred by the Florida economic loss rule where "[l]ike *In re Takata*, Cardenas seeks economic loss damages for his "fraud or fraudulent concealment" claim, which alleges precisely what his breach of warranty claim alleges—that his Toyota Camry did not work as promised.")

### 4. Plaintiffs' State-Specific Consumer Protection Act Claims Fail

Defendants move to dismiss all of Plaintiffs' claims under state consumer protection laws. First, Defendants generally argue that Plaintiffs have failed to adequately plead state consumer protection claims based on alleged misrepresentations because (1) plaintiffs reliance on marketing material fails to pass Rule 9(b) particularity and (2) plaintiffs take issue with general statements of opinion that are mere puffery; and (3) "even if any of the statements quoted in the Complaint were more than puffery, they cannot support a consumer protection claim because plaintiffs do not allege they saw or relied upon them." [Dkt. No. 22 at 33]. Second, Defendants contend that all Plaintiffs (except Florida) have not adequately pled alleged omissions. Finally, Defendants argue that each Plaintiff has independently failed to state a claim under each of their respective state consumer fraud statutes.

The Court disagrees with Defendants' preliminary argument that Plaintiffs' allegations cannot support a consumer protection claim at this stage. As plead, Plaintiffs claim "that they underlined on marketing materials that touted the enduring quality, durability, and value of Mercedes' vehicles." (Compl. ¶ 16, 21, 27, 32, 43, 48, 52, 48, 63). Defendants contend that this allegation is insufficient, emphasizing that "allegations of fraudulent misrepresentations must include time, place, and specific contents of the false representations." [Dkt. No. 22 at 31 (internal quotations omitted) (quoting

Sanchez v. Aurora Loan Servs., LLC, 2014 U.S. Dist. LEXIS 199631, at *67 (C.D. Cal. Mar. 11, 2014))]. The Complaint, however, demonstrates as much.

First, the Complaint establishes that Defendants "directly market[] the Class Vehicles to consumers via extensive nationwide, multimedia advertising campaigns on television, the Internet, billboards, print publications, mailings, and through other mass media." (Compl. ¶102). It goes on to describe the contents of the Defendants' purportedly false representations made through these outlets. Importantly, the complaint includes Mercedes' statements explaining its paint technology and process, in detail—actionable statements that represent more than mere puffery. (Id. at ¶¶ 111-14). Plaintiffs explicitly allege that both Defendants made such representations beginning "no later than 2010, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale/lease, and on an ongoing basis, and continuing to this day." (Id. at ¶ 185).

It is plausible, then, to infer from the Complaint that the representations at issue were made in commercials, ads, warranties, and Mercedes' Website and other publications—which Plaintiffs further alleged they each viewed, prior to purchasing their class vehicles. (Id. at ¶ 16, 21, 27, 32, 43, 48, 52, 48, 63). Finally, Plaintiffs demonstrate their alleged reliance by reiterating that all the representations contained in the complaint, pertaining to the Mercedes paint, "led Plaintiffs and Class members to form a reasonable belief and expectation that the paint used on the Class Vehicles was of high quality, would endure, and positively impact the value of the Vehicles, and certainly caused the reasonable consumer not to expect that the paint used on the Class Vehicles would cause its clearcoat to peel, flake, or bubble under normal conditions, and cause other problems that would negatively impact the value of the Vehicle." (Id. at ¶ 115).

Next, the Court rejects Defendants remaining preliminary arguments for dismissal of the statutory consumer fraud claims, as these are duplicative of those advanced with respect to dismissal of Plaintiffs' fraudulent concealment claim. Specifically, the Court already determined that not <u>all</u> of the representations Plaintiffs base their fraud claim on are mere puffery, and that Plaintiffs sufficiently allege reliance on actionable statements.[13] Accordingly, Plaintiffs have plead fraud with sufficient particularity so as to sustain claims based on misrepresentations.

Defendants also submit that "California, Kansas, New Jersey, New York, and North Carolina plaintiffs have not pled state consumer protection claims based on alleged omissions." Again, Defendants rely on their earlier argument for support—that plaintiffs failed to adequately plead Defendants' knew of the alleged defect before Plaintiffs purchased their Class Vehicles. For the same reasons that the Court discussed <u>supra</u>, Plaintiffs have sufficiently plead factual allegations to support Defendants presale knowledge of the alleged Paint Defect; the Court rejects dismissal of any statutory fraud claim on that basis. The Court will subsequently address each statutory claim individually.[14]

a.  <u>North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA")</u>

Under North Carolina Count I, Plaintiff Mull claims that Defendants' violated the UDTPA. Pursuant to the North Carolina UDTPA, "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen. Stat. Ann. § 75-1.1. To state a claim for unfair and

---

[13] The Court will not analyze these issues any further.
[14] Defendants' make no additional arguments for dismissal of the statutory fraud claim under Kansas law, therefore, Defendants' Motions to Dismiss Kansas Count I will be denied.

deceptive trade practices under North Carolina law, plaintiff must sufficiently allege "(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." Spartan Leasing Inc. v. Pollard, 101 N.C. App. 450, 460, 400 S.E.2d 476, 482 (1991).

Defendants' submit that Plaintiff Mull fails to state a claim under the UDTPA because he fails to plausibly allege "actual injury." [Dkt. No. 22 at 37]. North Carolina courts have held that "a plaintiff must prove its actual injury occurred as a result of defendant's unfair or deceptive activity." Simaan, Inc. v. BP Prod. N. Am., Inc., 395 F. Supp. 2d 271, 276 (M.D.N.C. 2005); Food Lion, Inc. v. Capital Cities/ABC, Inc., 964 F. Supp. 956, 960 (M.D.N.C. 1997), aff'd on other grounds, 194 F.3d 505 (4th Cir. 1999) ("The UTPA requires a plaintiff, in order to recover damages, to show actual injury proximately caused by the alleged wrongful conduct."

Here, Plaintiff Mulls' injuries are limited, in that the cost of having his Class Vehicle repainted was covered under his warranty. (Compl. ¶ 55). Accordingly, Plaintiff Mull asserts that Defendants' allegedly deceptive acts caused diminution in the value of his Class Vehicle and overpayment of that vehicle, specifically alleging that he (and class members) "would have paid less for their vehicles or would not have purchased or leased them at all." (Id. at ¶¶ 54, 1395). In opposition to Defendants' argument, Plaintiff submits that both forms of injury are sufficient to withstand a motion to dismiss a UDTPA claim.

Under North Carolina Law, when a plaintiff only seeks a remedy "for possible *future* expenses not yet incurred," such "hypothetical" damages are insufficient to show actual injury under the UDTPA. Coker v. DaimlerChrysler Corp., 617 S.E.2d 306, 313

(N.C. Ct. App. 2005), aff'd, 627 S.E.2d 461 (2006). In Coker, plaintiffs' sought damages to install brake shift interlocks ("BSI") not present in certain Chrysler minivans. Id. at 308. In seeking relief under the North Carolina UDTPA, plaintiffs alleged they sustained injuries "due to the future cost of installing the brake shift interlock in Chrysler minivans and/or the difference in value between minivans with the brake shift interlock device and those without it." Id. at 311. The Court held that plaintiffs' "unsubstantiated diminution of value allegedly caused by a purported 'defect' and the cost of 'supposed' remedial measures . . . [were] too speculative and illusory to show a legal injury in fact." Id.

Importantly, the plaintiffs in Coker, unlike Plaintiffs here, "present[ed] no allegations or argument that defendant's vehicles [were] defective without BSIs. Id. at 312. In fact, when the plaintiffs purchased their vehicles, they were unaware of BSIs, and thus, "[they] received exactly what they contracted for." Id. Therefore, the Coker case is distinguishable from the factual allegations presented here. Plaintiffs' allege that they did not get what they contracted for, that their Class Vehicles maintain a Paint Defect, and that, as a result of Defendants' unfair and deceptive trade practices, they suffer loss from a presently diminished value in their vehicles. To be sure, Plaintiff Mull has not alleged any attempt to sell his Class Vehicle. However, even if the diminished value alleged was too "hypothetical," Mull maintains an additional allegation of injury, not at issue in Coker—overpayment. Defendants' provide no authority that this alleged injury is insufficient to sustain a claim under the UDTPA. Therefore, the Court finds that Mull sufficiently establishes an actual injury.

Next, Defendants argue that Plaintiff Mull's UDTPA claim further fails because it is barred by the North Carolina Economic loss Rule. The Court Disagrees.

Pursuant to the economic loss doctrine, "ordinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor." Severn Peanut Co. v. Indus. Fumigant Co., 826 F. Supp. 2d 871, 873 (E.D.N.C. 2011). Under North Carolina law, the doctrine is not without limitations. Id. "North Carolina appellate courts have not yet decided whether to extend the economic loss rule to claims based on frauds or unfair trade practices." Bussian v. DaimlerChrysler Corp., 411 F. Supp. 2d 614, 627 (M.D.N.C. 2006) (citing Coker, 617 S.E.2d at 318 (Hudson, J. dissenting) (rejecting the application of the economic loss rule to UDTPA claims because "the economic loss rule is judicial, not legislative, and must give way to specific legislative policy pronouncement allowing damages for economic loss" (quoting National Consumer Law Center, *Unfair and Deceptive Trade Practices Manual,* S. 4.2.16.2 (6th Edition 2004)))); In re MyFord Touch Consumer Litig., 46 F. Supp. 3d 936, 967 (N.D. Cal. 2014) ("As the Fourth Circuit indicated, no state court has expressly ruled on whether claims under the consumer protection statute may be barred by the economic loss rule. Only a few federal district courts in North Carolina have so ruled.").

Considering that whether the economic loss rule bars UDTPA claims under North Carolina law is an unsettled issue, the Northern District of California has, at least twice, decided to permit North Carolina UDTPA claims, despite that the plaintiff's claims were based on pure economic loss. See In re MyFord Touch Consumer Litig., 46 F. Supp. 3d 936, 967 (N.D. Cal. 2014); In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig., 295 F. Supp. 3d 927, 1021 (N.D. Cal. 2018) (applying North Carolina law and finding, "the economic loss doctrine is not a bar to a statutory consumer protection claim").

Defendants' rely on <u>Bussian</u> in arguing that, regardless of the split on authority, North Carolina's economic loss rule "compels dismissal to preserve the contract and warranty system." [Dkt. No. 35 at 15]. The Court disagrees. First, the <u>Bussian</u> court limited its holding—that the economic loss rule precluded the plaintiff's claim for unfair or deceptive trade practices under North Carolina law,—"to cases such . . . involving allegations of a defective product where the only damage alleged is damage to the product itself and the allegations of unfair trade practices are intertwined with the breach of contract or warranty claims." <u>Bussian</u>, 411 F. Supp. 2d at 627. Second, even following the <u>Bussian</u> decision, "in the face of such uncertainty, federal courts have declined to extend the [economic loss] rule to bar UDTPA claims." <u>Martin v. Bimbo Foods Bakeries Dist., LLC</u>, No. 5:15-CV-96, 2015 WL 1884994, at *7 (E.D.N.C. Apr. 24, 2015) (collecting cases); <u>see</u> <u>also</u> <u>Yancey v. Remington Arms Co., LLC</u>, 2013 WL 5462205, at *10 n.13 (M.D.N.C. Sept. 30, 2013).

To the extent that the <u>Bussian</u> holding may apply here, Defendants' provide little argument as to why Plaintiff Mull's claim arises from issues that are intertwined with claims for breach of contract/warranty so as to bar their claim under the economic loss rule. [Dkt. No. 22 at 36; Dkt. No. 35 at 15]. Accordingly, absent a more compelling argument, the Court declines to extend the North Carolina economic loss rule to preclude the statutory claim under UDTPA. <u>See</u> <u>In re Caterpillar, Inc., C13 & C15 Engine Prod. Liab. Litig.</u>, No. 1:14-CV-3722, 2015 WL 4591236, at *36 (D.N.J. July 29, 2015) (departing from <u>Bussian</u> and agreeing with <u>In re MyFord Touch</u>, in finding that the court was "not bound to find Plaintiffs' North Carolina consumer protection claims barred by the economic loss doctrine in the absence of clear direction from the North

Carolina state courts"). Therefore, the Court will deny Defendants' Motions to Dismiss

Plaintiff Mull's claim under North Carolina Count I.[15]

b.  The New Jersey Consumer Fraud Act

The New Jersey Consumer Fraud Act ("CFA") prohibits "[t]he act, use or

employment by any person of any unconscionable commercial practice, deception,

fraud, false pretense, false promise, misrepresentation, or the knowing concealment,

suppression, or omission of any material fact with the intent that others rely upon such

concealment, suppression or omission, in connection with the sale or advertisement of

any merchandise or real estate, or with the subsequent performance of such person as

aforesaid, whether or not any person has in fact been misled, deceived or damaged

thereby." N.J. Stat. Ann. §56:8-2. "[T]o state a claim under the CFA, a plaintiff must

allege each of three elements: (1) unlawful conduct by the defendants; (2) an

ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the

defendants' unlawful conduct and the plaintiff's ascertainable loss." New Jersey Citizen

Action v. Schering-Plough Corp., 842 A.2d 174, 176 (N.J. App. Div. 2003) (citation

omitted).

Defendants contend that Plaintiff Ponzio fails to state a viable claim under the CFA

because the alleged Paint Defect manifested after his warranty period expired. In so

---

[15] Defendants' additionally cite to Third Circuit precedent in support of dismissing the North
Carolina claim pursuant to the economic loss rule. The Case, Werwinski v. Ford Motor Co., 286
F.3d 661 (3d Cir. 2002), held that claims for fraudulent concealment and unfair trade practices
were barred by the economic loss rule, under Pennsylvania law. "[T]he Third Circuit's reasoning
as to the applicability of the economic loss doctrine to Plaintiffs' claims under the Pennsylvania
consumer protection statute does not bind this Court as to the law applicable to Plaintiffs'
consumer protection claims under [other state's laws including] North Carolina law." In re
Caterpillar, 2015 WL 4591236, at *34 (D.N.J. July 29, 2015)

arguing, Defendants rely on <u>Nobile v. Ford Motor Co.</u>, No. CIV.A. 10-1890, 2011 WL 900119, at *5 (D.N.J. Mar. 14, 2011).

<u>Nobile</u> illustrates that courts in this district have held that a plaintiff who brings a CFA claim based on a product defect, fails to establish ascertainable loss when that defect manifests after a warranty's expiration. <u>Id.</u> at *5 (collecting cases). In <u>Nobile</u>, plaintiffs alleged that Ford was liable under the CFA for concealing transmission defects in their vehicles, which manifested after Ford's express warranties expired. <u>Id.</u> at *1. On a motion to dismiss, the court held that plaintiffs failed to state a claim under the CFA because they could not establish an ascertainable loss.

To be sure, Courts are more reluctant to dismiss CFA claims based on defects arising post-warranty where the defects involve safety concerns. <u>See</u> <u>Baranco v. Ford Motor Co.</u>, No. 17-CV-03580, 2018 WL 5474549, at *6 (N.D. Cal. Oct. 26, 2018); <u>Perkins v. DaimlerChrysler Corp.</u>, 890 A.2d 997, 1004 (N.J. Super. App. Div. 2006). In <u>Perkins v. DaimlerChrysler</u>, the plaintiff alleged her Jeep suffered from an exhaust defect and claimed Jeep was liable under the CFA because it allegedly concealed that the vehicle was manufactured with an exhaust "susceptible to cracking and premature failing, and unlikely to last for 250,000 miles . . . the industry standard for such a part." 890 A.2d at 1004. There, the court affirmed the dismissal of the plaintiff's complaint because:

> absent those circumstances in which safety concerns might be implicated, as to which we offer no view—the failure of a manufacturer or seller to advise a purchaser that a part of a vehicle may breakdown or require repair after the expiration of the warranty period cannot constitute a violation of the CFA. Our determination is driven by the fact that, in this case, it was not alleged that the deterioration or failure of such a part represented a danger to others. It also was not alleged that the exhaust manifold has even actually required repair or replacement, and it was not alleged that defendant contractually agreed to repair or replace plaintiff's manifold exhaust beyond the requirements of its warranty program. Based upon the absence of any

> such allegations, we conclude that plaintiff can have no viable CFA cause of
> action.

Id. at 1004. One district court determined that Perkins "stands for the proposition that merely alleging that the warranty is shorter than the industry standard useful life of the product does not state a claim under the CFA." Maniscalco v. Brother Int'l Corp. (USA), 627 F. Supp. 2d 494, 501 (D.N.J. 2009).

Here, there is no dispute that Plaintiff Ponzio's factual allegations establish that his Class Vehicle performed as warranted for the duration of his warranty. (Compl. ¶¶ 15, 18). There are also no allegations showing that the Paint Defect is in any way a safety hazard. Plaintiffs, however, contend that a CFA "claim based on a defect that manifests outside of the warranty period is [also] viable where a defendant knew with certainty that the product or component at issue was going to fail." [Dkt. No. 27 at 29-30]. To support this proposition, Plaintiffs cite to Mickens v. Ford Motor Co., 900 F. Supp. 2d 427, 442 (D.N.J. 2012). The Court finds that case distinguishable.

In Mickens' the court's focus was whether plaintiff could show element one under the CFA, unlawful conduct. Id. at 436 ("'ascertainable loss,' is less central to the contentions on this motion."). Accordingly, it was in the context of unlawful conduct, that the court rejected defendant's argument "that a warranty covering a potential defect precludes a material-omission claim under the CFA that the defendant knowingly concealed that defect." Id. at 443. The Court's concern here, is whether Ponzio has demonstrated ascertainable loss. Moreover, the plaintiff in Mickens, unlike Plaintiff Ponzio, "adequately alleged that the [supposed] defect arose during the warranty period. Id. at 443 (emphasis added).

Still, New Jersey precedent on this issue is unclear. See Noble v. Porsche Cars N. Am., Inc., 694 F. Supp. 2d 333, 337 (D.N.J. 2010). Courts have permitted cases involving allegations of Defendants' superior knowledge of the alleged defect to state a claim under the CFA. Tatum v. Chrysler Group, LLC, No. 10–cv–4269, 2011 WL 1253847 (D.N.J. March 28, 2011); Maniscalco v. Brother Int'l Corp. (USA), 627 F. Supp. 2d 494, 502 (D.N.J. 2009); In re Ford Motor Co., Spark Plug & 3-Valve Engine Prod. Liab. Litig., No. 1:12-MD-2316, 2014 WL 3778592, at *28 (N.D. Ohio July 30, 2014). Notably, the district court in Maniscalco, considering the broad protection of the CFA, found "[i]f the New Jersey Supreme Court were faced with a situation where a manufacturer or seller of a product knew that its product had a defect which would cause it to fail before its expected useful life, and intentionally concealed that information from a purchaser, with the purpose of maximizing profit, I predict that the New Jersey Supreme Court would not be willing to find, as a matter of law, that the CFA was categorically inapplicable." Maniscalco v. Brother Int'l Corp. (USA), 627 F. Supp. 2d 494, 502 (D.N.J. 2009).

After a review of the conflicting opinions on the issue, the Court finds that dismissal of Plaintiff Ponzio's CFA claim is proper. While "the defendant's knowledge of a defect may be relevant in determining whether that defendant committed an unlawful act," most courts hold that is it inapposite when determining "whether the plaintiff suffered ascertainable loss." In re Porsche Cars N. Am., Inc., 880 F. Supp. 2d 801, 857 (S.D. Ohio 2012) (applying New Jersey law, collecting cases). Three New Jersey District Court cases have held that "there was no ascertainable loss, [even] where the plaintiffs allegedly concealed the defects and where safety concerns were alleged." Nobile, 2011 WL 900119,

at *6; <u>Noble</u>, 694 F. Supp. 2d at 337; <u>Duffy v. Samsung Elecs. Am., Inc.</u>, No. CIV.06-5259, 2007 WL 703197, at *8 (D.N.J. Mar. 2, 2007).

Furthermore, even if Plaintiff Ponzio could maintain a viable CFA claim by pleading that Defendants knew with certainty that Mars Red paint was going to fail, he still insufficiently alleges ascertainable loss. "Ascertainable loss" is "either an out-of-pocket loss or a demonstration of loss in value that is quantifiable or measurable." <u>Marcus v. BMW of N. Am.</u>, LLC, 687 F.3d 583, 606 (3d Cir. 2012). Here, Plaintiff Ponzio alleges that he "suffered a concrete and ascertainable loss as a direct and proximate result of Mercedes' misconduct in that Plaintiff overpaid for his Class Vehicle at the time of purchase, and the value of his Class Vehicle has been diminished as a result of the Paint Defect." (Compl. ¶ 19). Under his CFA claim, he similarly alleges that "[he] and the New Jersey Class members suffered ascertainable loss and actual damages as a direct and proximate result of Mercedes' concealment, misrepresentations, and/or failure to disclose material information." (<u>Id.</u> at ¶ 1271). Such allegations provide no out-of-pocket expense to Ponzio or information to otherwise quantify his loss.

While "plaintiff need not . . . plead ascertainable loss with pinpoint specificity," such conclusory allegations, without more, are insufficient to establish ascertainable loss. <u>Mickens</u>, 900 F. Supp. 2d at 446; <u>see</u> <u>In re Caterpillar</u>, 2015 WL 4591236, at *38 ("Although Plaintiffs here allege losses stemming from the diminished value of their vehicles and the cost of repeated repairs, the absence of any information to quantify these losses renders their pleading inadequate under the CFA as to ascertainable loss.") Therefore, the Court will dismiss Plaintiff Ponzio's CFA claim and grant Defendants' Motions as to New Jersey Count I.

c. <u>California Unfair Competition Law And False Advertising Law</u>

**i.** **Plaintiffs' California Unfair Competition Law Claim (California Count I)**

"The UCL prohibits 'any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising.'" <u>Sloan v. Gen. Motors LLC</u>, 287 F. Supp. 3d 840, 865 (N.D. Cal. 2018), <u>order clarified</u>, No. 16-CV-07244, 2018 WL 1156607 (N.D. Cal. Mar. 5, 2018), and <u>on reconsideration</u>, 2020 WL 664033 (N.D. Cal. Feb. 11, 2020) (citing Cal. Bus. & Profs. Code § 17200). Here, Plaintiffs allege claims under all three prongs, asserting that Defendants violated the UCL by: (1) selling the Class Vehicles to Plaintiffs (and California class members) knowing of the Paint Defect; (2) marketing the Class Vehicle as defect-free, affirmatively representing the quality of its vehicles, the paint, and paint process; and (3) violating California statutory and common law prohibiting false advertising, fraudulent concealment, and breach of implied warranty. (Compl. ¶ 362).

*1. Unlawful Business Act or Practice*

Unlawful business acts for purposes of the UCL are "'anything that can properly be called a business practice and that at the same time is forbidden by law . . . be it civil, criminal, federal, state, or municipal, statutory, regulatory, or court-made,' where court-made law is, 'for example a violation of a prior court order.'" <u>Sybersound Records, Inc. v. UAV Corp.</u>, 517 F.3d 1137, 1151 (9th Cir. 2008) (quoting <u>Nat'l Rural Telecomm. Co–op. v. DIRECTV, Inc.</u>, 319 F. Supp. 2d 1059, 1074 & n.22 (C.D. Cal. 2003)).

In the present case, Defendants submit that Plaintiffs "fail to sufficiently plead that [they] violated any law that could support a UCL 'unlawful' business practices claim." [Dkt. No. 22 at 34]. In opposition, Plaintiffs submit that Montgomery and Salgado have

each pled claims for fraudulent concealment and violations under the California Fair Advertising Law, in addition to their breach of warranty claims, permitting the UCL claim. The Court finds that the independent violations of California state law and federal law alleged in Plaintiffs' Complaint fail to state a claim.

For the reasons provided herein, the Court will dismiss those claims relied on by Plaintiffs and thus, Plaintiffs do not sufficiently plead that Defendants violated a law to support their UCL claim. Therefore, the Court will grant Defendants' Motions to Dismiss Salgado's and Montgomery's UCL claim under California Count I.

### 2. *Unfair Business Practice*

An unfair practice, however, does not need to violate any law; rather it entails any practice where "the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided." <u>Daugherty v. Am. Honda Motor Co.</u>, 51 Cal. Rptr. 3d 118, 129 (Cal. Ct. App. 2006), <u>as modified</u> (Nov. 8, 2006). As the Ninth Circuit has explained, "California courts must determine whether the practice undermines a legislatively declared policy or threatens competition, or whether the practice has an impact on its alleged victim that outweighs the reasons, justifications, and motives of the alleged wrongdoer." <u>Comercializadora Recmaq Limitada v. Hollywood Auto Mall, LLC</u>, No. 12CV0945, 2013 WL 2248140, at *11 (S.D. Cal. May 20, 2013).

Plaintiffs allege that Defendants participated in an unfair practice by failing to disclose the Paint Defect. Defendants, here, argue that Plaintiff cannot state a claim on that basis because they fail to allege Defendants' presale knowledge of the alleged Paint Defect so as to warrant disclosure, an issue this Court resolves in Plaintiffs' favor above.

Accordingly, because the Court finds that there are adequate allegations of presale knowledge, Plaintiffs' UCL claim, based on the unfair practice prong, will survive the Motions to Dismiss. See Falk v. Gen. Motors Corp., 496 F. Supp. 2d 1088, 1098 (N.D. Cal. 2007) (holding that plaintiffs stated an unfair practices claim where defendant, a car manufacturer, "failed to meet its duty to disclose any known and material defects").

### 3. *Fraudulent Practices or Acts*

Lastly, "[t]o state a claim under [the fraudulent] prong, a plaintiff's 'burden of proof is modest: the representative plaintiff must show that members of the public are likely to be deceived by the practice.'" Friedman v. AARP, Inc., 855 F.3d 1047, 1055 (9th Cir. 2017) (quoting Prata v. Superior Court, 111 Cal. Rptr. 2d 296, 308 (Cal. Ct. App. 2001)). Here, Plaintiffs allege that Defendants violate this prong based on their misrepresentations and omissions about the Paint Defect. Defendants contend, however, that there can be no UCL claim based on fraudulent omissions because Defendants had no duty to disclose the alleged defect under California law, which requires facts showing the defect is an unreasonable safety hazard. [Dkt. No. 22 at 34-35].[16] The Court disagrees.

To be sure, fraudulent omissions are actionable under the UCL. Daniel v. Ford Motor Co., 806 F.3d 1217, 1225 (9th Cir. 2015). "In order to state a claim of fraudulent omissions . . . a plaintiff must allege facts either showing that the alleged omissions are

---

[16] In Defendants moving briefs, they also contend that Plaintiffs' UCL fraud claim fails because the California plaintiffs do not plead facts that show presale knowledge of a defect or otherwise sustain fraud claims based on misrepresentations or omissions. Defendants advance the same arguments for dismissal of Plaintiffs' fraudulent concealment claim. Accordingly, the Court addressed those arguments above and found that there is adequate allegations of presale knowledge and fraud based on misrepresentations and omissions. There is no reason for any further analysis. Therefore, the Court finds that Plaintiffs' California consumer fraud claim does not fail for those reasons now.

contrary to a representation actually made by the defendant, or showing an omission of a fact the defendant was obliged to disclose." Andren v. Alere, Inc., 207 F. Supp. 3d 1133, 1141 (S.D. Cal. 2016) (quoting Davidson v. Kimberly–Clark Corp., 76 F. Supp. 3d 964, 972 (N.D. Cal.2014) (internal quotations omitted); Berryman v. Merit Prop. Mgmt., Inc., 62 Cal. Rptr. 3d 177, 188 (Cal. Ct. App. 2007) ("Absent a duty to disclose, the failure to do so does not support a claim under the fraudulent prong of the UCL."). "An obligation [to disclose] arises when a defendant manufacturer 'had exclusive knowledge of material facts not known to the plaintiff,' and/or 'actively conceal[ed] a material fact from the plaintiff.'" Falco v. Nissan N. Am. Inc., 96 F. Supp. 3d 1053, 1063 (C.D. Cal. 2015) (quoting Smith v. Ford Motor Co., 749 F. Supp. 2d 980, 987 (N.D.Cal.2010) aff'd, 462 Fed. Appx. 660 (9th Cir.2011)).

Defendants rely on Wilson v. Hewlett-Packard Co. in arguing that the duty to disclose additionally requires the plaintiffs to show that the paint defect presented a safety hazard. The Ninth Circuit in Wilson noted that "California courts have generally rejected a broad obligation to disclose," and held that plaintiffs were required to "allege that the design defect caused an unreasonable safety hazard" to state a claim for fraud under the UCL. 668 F.3d 1136, 1141 (9th Cir. 2012) (citing to Daugherty v. American Honda Motor Co., 51 Cal. Rptr. 3d 118 (Cal. Ct. App. 2006) and Oestreicher v. Alienware Corp., 544 F. Supp. 2d 964, 969 (N.D. Cal. 2008)).

Notwithstanding, California case law provides that courts are split on this particular issue—whether, under the UCL, omissions must relate to safety concerns. See Norcia v. Samsung Telecommunications Am., LLC, No. 14-CV-00582, 2015 WL 4967247, at *6 (N.D. Cal. Aug. 20, 2015) ("Some federal courts have adopted a 'safety concern' limitation . . ."); Hodsdon v. Mars, Inc., 891 F.3d 857, 861–62 (9th Cir. 2018) ("[T]he

recent California cases do cast doubt on whether <u>Wilson</u>'s safety-hazard requirement

applies in all circumstances . . ."). In fact, the Ninth Circuit has reviewed recent

California Courts of Appeal decisions following <u>Wilson</u>, to find that this "safety-hazard"

requirement "is not necessary in *all* omission cases." <u>Hodsdon</u>, 891 F.3d at 861–62. The

<u>Hodson</u> Court declined to rely or overrule <u>Wilson</u>, however, it determined that UCL

omission claims are sufficiently plead if "the defect was central to the product's

function." <u>Id.</u> at 863. Accordingly, "[t]he Ninth Circuit further observed that the 'central

function' cases 'are not necessarily irreconcilable with *Wilson* because, where the

challenged omission does not concern a central functional defect, the plaintiff may still

have to plead a safety hazard to establish that the defendant had a duty to disclose.'"

<u>Hoai Dang v. Samsung Elecs. Co.</u>, No. 14-CV-00530, 2018 WL 6308738, at *6 (N.D. Cal.

Dec. 3, 2018) (quoting <u>Id.</u> at 864).

   This Court declines to answer the immediate issue of whether Plaintiffs claim fails

for the failure to plead a defect that poses and unreasonable safety hazard. After careful

review of the cases cited by the parties, and the decisions in <u>Wilson</u> and <u>Hodson</u>, the

Court finds that Plaintiffs are, however, required to show that the alleged defect was

central to the function of their Class Vehicle. <u>See</u> <u>In re Apple Inc. Device Performance</u>

<u>Litig.</u>, 386 F. Supp. 3d 1155, 1176 (N.D. Cal. 2019) (similarly finding that most California

cases "appear to conclude that <u>either</u> a safety hazard <u>or</u> a central function defect trigger

a duty to disclose" (emphasis added)). Plaintiffs have failed to do so. The Complaint in

the present case is devoid of any factual allegation that a vehicle's paint is central to the

function of an automobile.

    Importantly though, this failure, is the failure to plead a fraudulent practice based

solely on Defendants' failure to disclose omissions; Plaintiffs may still maintain a

fraudulent practice claim under the stature where the alleged omissions are contrary to representations actually made by Defendants. <u>Andren</u>, 207 F. Supp. 3d at 1141. Contrary to Defendants' contentions, California Plaintiffs have sufficiently identified representations they purportedly relied on, as the Court explained earlier in this Opinion.[17] Therefore, Plaintiffs state a claim under the fraudulent practice prong of the UCL based on misrepresentations.

California Count I may proceed under both the unfair practices prong and fraudulent practices prong of the UCL. In all other regards, Count I will be dismissed.

### ii.     Fair Advertising Law Claims (California Count II)

The California Fair Advertising Law ("FAL") proscribes "mak[ing] or disseminat[ing] . . . any statement . . . which is untrue or misleading, and which is known, or by the exercise of reasonable care should be known, to be untrue or misleading . . . with intent directly or indirectly to dispose of real or personal property." <u>Stewart</u>, 304 F. Supp. 3d at 906 (citing Cal. Bus. & Prof. Code § 17500). Defendants contend that claims based on omissions are not actionable under the FAL. Therefore, because Plaintiff Montgomery and Plaintiff Slagado "fail to identify any particular statement from [Defendants] on which they allegedly relied. . . . their FAL claim fails." [Dkt. No. 35 at 12].

The majority of California Courts have held that "[t]here can be no FAL claim where there is no 'statement' at all," to the extent that, a plaintiff cannot sustain an FAL claim based on <u>pure omission</u> theories—where the plaintiff has alleged no actual misleading statements or untrue statements. <u>Norcia v. Samsung Telecommunications Am., LLC</u>, No. 14-CV-00582, 2015 WL 4967247, at *8 (N.D. Cal. Aug. 20, 2015) (collecting cases)

---

[17] <u>See</u> discussion <u>supra</u> pp. 56-58.

(dismissing an FAL claim where "Plaintiff . . . alleged no direct communications with [defendant] or any untrue or misleading statement by [defendant]").[18] Therefore, as explained by the Northern District of California, "[w]hen the crux of a plaintiff's FAL claim is that the defendant did not make any statement at all about a subject, then a claim under the FAL may not advance." <u>Hodsdon v. Mars, Inc.</u>, 162 F. Supp. 3d 1016, 1023 (N.D. Cal. 2016), <u>aff'd,</u> 891 F.3d 857 (9th Cir. 2018).

However, "a plaintiff may state a claim under the FAL if the defendant actually made a statement, but omitted information that undercuts the veracity of the statement." <u>Id.</u> (citing <u>In re Sony Gaming Networks & Customer Data Sec. Breach Litig.</u>, 996 F. Supp. 2d 942, 991 (S.D. Cal. 2014) (permitting a FAL claim for fraud-based omissions where plaintiffs alleged the defendant made misrepresentations, which omitted certain information about the product); <u>Tait v. BSH Home Appliances Corp.</u>, No. SACV 10-00711, 2011 WL 3941387, at *3 (C.D. Cal. Aug. 31, 2011) (permitting a FAL claims where plaintiffs alleged defendant's representations were misleading)).

Here, Plaintiffs allege that the Defendants actually made certain statements regarding their vehicles and the paint used thereon, which they further contend were false or misleading. (Compl. ¶ 369). Plaintiffs also allege that that Defendants' omitted information from these "misrepresentations." (<u>Id.</u> at ¶ 370). Therefore, California Plaintiffs do not base their FAL claim on a "pure" omission theory. Furthermore,

---

[18] <u>See</u> <u>also</u> <u>Stanwood v. Mary Kay, Inc.</u>, 941 F. Supp. 2d 1212, 1222 (C.D. Cal. 2012) ("Because [plaintiff] has not adequately alleged that [defendant] made any actual misleading or untrue statements, she cannot make out a claim under the FAL."); <u>Dana v. Hershey Co.</u>, 180 F. Supp. 3d 652, 669 (N.D. Cal. 2016), <u>aff'd,</u> 730 F. App'x 460 (9th Cir. 2018) ("Because [plaintiff] bases her claims on <u>pure omissions</u>, she fails to allege that [defendant] ma[d]e or disseminate[d] or cause[d] to be made or disseminated any false or misleading statement, and thus fails to state a claim under the FAL." (emphasis added) (internal quotations omitted)).

because the Court finds the Plaintiffs adequately plead misrepresentations and omissions, Plaintiffs Montgomery and Salgado have stated a claim under the FAL. Notwithstanding, Defendants argue that the FAL claim further fails because it is untimely; that argument is addressed below.

    d.  <u>Claims under Florida, New York, and California Statutory Consumer Fraud Acts</u>

Defendants argue that Plaintiffs bringing claims under the California Fair Advertising Law, Florida Deceptive & Unfair Trade Practices Act, and New York General Business law are time-barred. All three arguments turn on whether Plaintiffs' have adequately tolled the state of limitations for each statute.

In their Complaint, Plaintiffs allege that the statute of limitations should be tolled based on fraudulent concealment, the discovery rule, and equitable estoppel. Plaintiffs have pled that "[a]ny applicable statute of limitation has been tolled by Mercedes' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing," (Compl. ¶ 187),  and that "Plaintiffs and Class members had no realistic ability to discern that the Class Vehicles were defective until – at the earliest – after the Paint Defect caused the clearcoat on their Vehicles to peel, flake, and bubble." (<u>Id.</u> at ¶ 190).

### i. **Fair Advertising Law (California Count II)**

At this point, the only remaining argument for dismissal of the FAL claim, is that the claim is time-barred. [Dkt. No. 22 at 35]. The FAL has a three-year applicable statute of limitations. Cal. Civ. Code § 338(a). The limitations period, here, accrued on the day Plaintiffs purchased their Class Vehicles. <u>See</u> <u>Plumlee v. Pfizer, Inc.</u>, No. 13-CV-00414, 2014 WL 695024, at *7 (N.D. Cal. Feb. 21, 2014). Plaintiff Montgomery purchased her Class Vehicle on or about February 5, 2015, and Plaintiff Salgado purchased his Class

Vehicle on or about January 24, 2014. This action was filed August 8, 2018, more than three years following both purchases in California.

Notwithstanding, Plaintiffs' contend that they have adequately plead facts to toll the statute of limitations under the discovery rule. [Dkt. No. 27 at 28]. "In California, the discovery rule postpones accrual of a claim until 'the plaintiff discovers, or has reason to discover, the cause of action.' " <u>Clemens v. Daimler Chrysler Corp.</u>, 534 F.3d 1017, 1024 (9th Cir.2008) (quoting <u>Norgart v. Upjohn Co.</u>, 21 Cal. 4th 383, 391 (1999)). To invoke the rule, Plaintiffs are required to factually allege "(1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence. The burden is on the plaintiff to show diligence, and conclusory allegations will not withstand' a motion to dismiss." <u>Plumlee</u>, 2014 WL 695024, at *8 (quoting <u>E–Fab, Inc. v. Accountants, Inc. Services</u>, 64 Cal. Rptr. 3d 9, 17 (Cal. Ct. App. 2007)).

First, the Complaint supports a plausible inference that Plaintiffs were unable to discover the defect earlier than its manifestation. Here, Plaintiffs allege that (1) Defendants' maintained exclusive knowledge of the defect; (2) Plaintiffs were unable to discover the defect; and (3) Defendants further concealed the defect from the Plaintiffs. Plaintiffs adequately support these allegations by including factual allegations as to Defendants exclusive, presale knowledge of the latent defect. Defendants' knowledge is supported by test, direct consumer complaints and potential other "internal sources unavailable to Plaintiffs without discovery." (Compl. ¶ 124).

The issue is whether Plaintiffs Montgomery and Salgado have adequately pled the time and manner of their discovery of this cause of action—the Paint Defect. "The purpose of this requirement is to afford the court a means of determining whether or not the discovery of the asserted invasion was made within the time alleged, that is,

whether plaintiffs actually learned something they did not know before." <u>Bennett v. Hibernia Bank</u>, 305 P.2d 20, 35 (Cal. 1956)

Plaintiff Montgomery alleges that she discovered her Class Vehicle suffered from the Paint Defect, "[i]n or about late 2015 or early 2016, [when she] noticed that the clearcoat on her Class Vehicle was bubbling, peeling, and flaking." (Compl. ¶ 50). The issue with Plaintiff Montgomery's clear coat is not something she knew of before. In fact, "Plaintiff specifically asked the sales representative whether she should have a gloss coat applied to the Vehicle or take other proactive measures in order to protect the paint," considering Montgomery's vehicle was used. The sales representative explained that "a protective coat had already been applied . . . and, as such, she would have no issues with the Vehicle's paint." (<u>Id.</u> at ¶48). Therefore, it is reasonable for the Court to determine she "had no reason to suspect wrongdoing, and there was no fact or circumstance to prompt an investigation" prior to this manifestation of defect. <u>Philips v. Ford Motor Co.</u>, No. 14-CV-02989, 2015 WL 4111448, at *8 (N.D. Cal. July 7, 2015).[19]

Accordingly, the statute of limitations began to run for Plaintiff Montgomery in "late 2015 or early 2016." Defendants contend that even if these allegations tolled the FAL claim, it does not show that the Complaint was filed within the limitations period. Here, discovery of the defect would have had to occur any time after August 8, 2015 to provide a claim within the limitations period. "[L]ate 2015 or early 2016" is sufficient to establish that Plaintiff discovered the defect within the limitations period.

---

[19]Like in <u>Phillips</u>, the California Plaintiffs, here, "need not allege facts showing diligence prior to the manifestation of the defect," because the product performed as expected until very point, and as such, "there was no duty to investigate prior to [the manifestation.]" <u>Id.</u>

As to Plaintiff Salgado, however, "the Court cannot establish a tolling date or evaluate which date should be used when deciding whether a plaintiff could have filed the suit on an earlier date." Gerstle v. Am. Honda Motor Co., Inc., No. 16-CV-04384, 2017 WL 2797810, at *7 (N.D. Cal. June 28, 2017). Plaintiff Salgado merely alleges that he "noticed that the clearcoat on his Class Vehicle was bubbling, peeling, and flaking" in approximately 2015. (Id. at ¶ 65). Even read liberally, Salgado's factual allegations do not show that he could prove his FAL limitations period was tolled, since discovery of the Paint Defect during the majority of that year, 2015, would still render his claim untimely. The Court will dismiss Plaintiff Salgado's FAL claim under California Count II.

### ii. Florida Deceptive & Unfair Trade Practices Act ("FDUTP")

Plaintiffs Jessica Irene Miller, Karina Kloczko, and Alex Acuna claim, on behalf of themselves and the Florida class, that Defendants violated the FDUTPA by "knowingly misrepresenting and intentionally concealing material facts regarding the quality of the Class Vehicles and the quality and benefits of the paint and paint process used on the Class Vehicles . . ." (Compl. Florida Count I). Defendants do not move to dismiss Plaintiff Miller's FDUTP claim or Plaintiff Acuna's FDUTPA claim.

Defendants argue that Plaintiff Kloczko's FDUTPA claim, however, is untimely under the applicable four year statute of limitations period. Fla. Stat. § 95.11(3)(f). There is no dispute that Plaintiff Kloczko alleges she purchased her Class Vehicle on May 14, 2014—over four years prior to the 2018 filing of this lawsuit. (Compl. ¶ 20).

"It is [also] well-settled there is no 'delayed discovery rule' applicable to FDUTPA claims." Speier-Roche v. Volkswagen Grp. of Am., Inc., No. 14-20107, 2014 U.S. Dist. LEXIS 59991, at *20 (S.D. Fla. Apr. 30, 2014). Hence, Defendants conclude that

Kloczko's claim is time-barred. In support of this argument, Defendants cite to

Matthews v. Am. Honda Motor Co., 2012 U.S. Dist. LEXIS 90802, at *12 (S.D. Fla. June

6, 2012). There, similar to the present case, plaintiff brought a claim under the FDUTPA

alleging that defendant, Honda, "committed an unfair and/or deceptive trade practice

because it was aware of the latent paint defect but nonetheless failed to disclose it or

mention it to [plaintiff] or the public at large." Id. at *3–4. The defendant argued that

the plaintiff's FDUTPA claim was time barred despite the delayed discovery of the

alleged unfair trade practice. The Southern District of Florida held that, under Florida

law, plaintiff "sustained damage the moment that she purchased the vehicle with the

alleged defect, even though the alleged defect did not manifest for several years." Id. at

*12.

Plaintiff, however, contends that the FDUTPA limitations period may still be, and is,

tolled when the Defendant engages in fraudulent concealment. [Dkt. No. 27 at 19].

Under Florida law, to toll the statute of limitations by fraudulent concealment, Plaintiff

must establish: "(1) successful concealment of the cause of action, (2) fraudulent means

to achieve that concealment, and (3) plaintiff exercised reasonable care and diligence in

seeking to discover the facts that form the basis of his claim." Burr v. Philip Morris USA

Inc., No. 07-01429, 2012 U.S. Dist. LEXIS 159084, at *10–11 (M.D. Fla. Sept. 28, 2012)

(citing Berisford v. Jack Eckerd Corp., 667 So. 2d 809, 811–12 (Fla. 4th DCA 1995)). The

fraudulent means "must go beyond mere-nondisclosure," and "must occur after the

plaintiff's cause of action has already accrued." Fisher v. Harley-Davidson Motor Grp.,

LLC, No. 2:19-CV-14154, 2019 U.S. Dist. LEXIS 181739, at *7 (S.D. Fla. Oct. 18, 2019).

Allegations that Defendants' knew of the alleged defect, failed to disclose it, and

actively concealed it, (Compl. ¶ 156, 185-87, 565-65), without more fail to demonstrate a

"willful concealment." See Padilla v. Porsche Cars N. Am., Inc., 391 F. Supp. 3d 1108, 1114 (S.D. Fla. 2019); Fisher, 2019 U.S. Dist. LEXIS 181739, at *7 (finding plaintiff failed to show Defendant deliberately and actively concealed the material facts, to toll an FDUTPA claim despite plaintiff's allegations that "[defendant] made misrepresentations or omissions . . . in five different mediums: (1) user manuals, (2) advertisements, (3) customer service interactions, (4) communications to its dealer network and regulators, and (5) a confidential settlement in related litigation").

Plaintiff Kloczko alleges that she discovered the Paint Defect "[i]n or about June 2017," when she "noticed that the clearcoat on her Class Vehicle was bubbling, peeling, and/or flaking"—less than four years before Plaintiffs' filed this action. (Compl. ¶23). After this discovery, Ms. Kloczko "brought her Class Vehicle to a MBUSA dealership to inquire about the Paint Defect" and her Vehicle was ultimately repainted. According to Plaintiffs, Defendants actively and fraudulently concealed of the Paint Defect when Ms. Kloczko was "told that [repainting] would repair the Defect" but later learned, after a third-party appraisal, that "the repainting did not actually repair the Paint Defect, and instead, reduced the value of her Vehicle," [Dkt. No. 27 at 29]. The Court disagrees.

Plaintiff Kloczko has insufficiently alleged that Defendant's fraudulent concealment tolled the statute of limitations period for the FDUTPA claim because her allegations fail to provide "the type of affirmative conduct required for fraudulent concealment under Florida law." Fisher, 2019 U.S. Dist. LEXIS 181739, at *11; see also In re Takata Airbag Prod. Liab. Litig., 193 F. Supp. 3d 1324, 1346 (S.D. Fla. 2016). In fact, the Complaint demonstrates that Mercedes personnel actually informed Kloczko her Vehicle "had a Paint Defect." (Compl. ¶ 23). Even if Defendants' conduct after the defect manifested "concealed" that repainting the defect still results in the loss in value of the vehicle, it

does not conceal the existence of the alleged defect, and as such did not actively conceal the cause of action. Therefore, the Court will dismiss Plaintiff Kloczko's FDUTPA claim, and grant Defendants' Motions to Dismiss Florida Count I, only as to Kloczko.

### iii.    The New York General Business Law ("GBL") Sections 349 and 350

Plaintiff Nelthrope brings claims under GBL Sections 349 and 350, under New York Count I and Count II respectively.  Defendants argue that both claims are time-barred and, because Plaintiff Nelthrope cannot establish any tolling of her GBL claims, both claims must be dismissed. [Dkt. No. 22 at 37].

Section 349 of the New York GBL prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Under that section, Plaintiff alleges Defendants are liable for "knowingly misrepresenting and intentionally concealing material facts regarding the quality of the Class Vehicles and the quality and benefits of the paint and paint process used on the Class Vehicles." (Compl. New York Count I). Section 350 of the GBL makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful." N.Y. Gen. Bus. Law § 350. The statute defines false advertising as, "advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect." Id. § 350-a. The applicable statute of limitations period for both Sections of the GBL is three years, which accrues upon injury. Gristede's Foods, Inc. v. Unkechauge Nation, 532 F. Supp. 2d 439, 453 (E.D.N.Y. 2007). "Such injury occurs 'when all of the factual circumstances necessary to establish a right of action have occurred, so that the plaintiff would be entitled to relief.'" Statler v. Dell,

Inc., 775 F. Supp. 2d 474, 484 (E.D.N.Y. 2011) ( quoting <u>Gaidon v. Guardian Life Ins. Co.</u> <u>of America</u>, 750 N.E. 2d 1078 (N.Y. App. Div. 2001)).

"The doctrine of equitable tolling applies where defendant's fraudulent conduct results in Plaintiff's lack of knowledge of a cause of action." <u>Id.</u> at 482 (quoting <u>Pearl v.</u> <u>City of Long Beach</u>, 296 F.3d 76, 82 (2d Cir. 2002). Accordingly, a plaintiff must establish that he was "unable, despite due diligence, to discover facts that would allow him to bring his claim in a timely manner or that defendant's actions induced plaintiff to refrain from commencing a timely action. <u>Statler v. Dell, Inc.</u>, 775 F. Supp. 2d 474, 482– 83 (E.D.N.Y. 2011). If plaintiff successfully pleads equitable tolling, the limitations period will not commence until "the plaintiff either acquires actual knowledge of the facts that comprise his cause of action or should have acquired such knowledge through the exercise of reasonable diligence after being apprised of sufficient facts to put him on notice." <u>Cerbone v. International Ladies' Garment Workers' Union</u>, 768 F.2d 45, 48 (2d Cir. 1985).

Plaintiffs contend that here, the doctrine of equitable tolling apples to Nelthrope's GBL claims. In support of this argument, Plaintiffs identify that Nelthrope alleges that she "took her Class Vehicle in to Mercedes-Benz of Nanuet for service. . . . [where she] brought the bubbling, peeling and flaking of her Class Vehicle's clearcoat to the attention of her service consultant in order to find out what was causing the problems." (Compl ¶ 60). According to the Complaint, the service consultant informed Plaintiff Nelthrope that her paint problems "were a result of normal wear and tear. . . [and] nobody at the dealership raised any issues pertaining to the problems with Plaintiff's Class Vehicle's clearcoat either during or after any subsequent occasion she took her Vehicle in for service." (<u>Id.</u>).

In determining whether equitable tolling applies, "the issue is not whether plaintiff was in possession of all of the information necessary to prevail on his claims, but whether plaintiff had enough information to commence a lawsuit," Marshall v. Hyundai Motor Am., 51 F. Supp. 3d 451, 464 (S.D.N.Y. 2014). Under the present pleading, it is not apparent from the face of the Complaint that "Plaintiff possessed more than enough information to commence a timely lawsuit." Statler, 775 F. Supp. 2d at 483.

Accepting Plaintiffs' factual allegations as true, it is plausible that Plaintiff Nelthrope did not have enough information when she first noticed the peeling of her Class Vehicle's paint to commence a lawsuit. Moreover, the facts seem to permit an inference that Plaintiff was lacking information because of Defendants' actions. Because it is too early to tell, the Court will permit Plaintiff Nelthrope's claims under the GBL. See Id. (denying defendant's motion to dismiss the plaintiff's claims under New York Law where "[s]uch claims may or may not be saved by equitable tolling; it is simply too early to tell"). The Court will, thus, deny Defendant's motion to dismiss New York Count I and Count II alleging claims under the New York GBL.[20]

---

[20] In response to Plaintiffs' argument, Defendants contend that "Nelthrope's claims that a dealer said her paint issue was "normal wear and tear" are not sufficient to establish tolling," [Dkt. No. 35 at 14], and cite to Feliciano v. GM LLC, 2016 U.S. Dist. LEXIS 194728, at *29 (S.D.N.Y. Mar. 31, 2016). The Court finds this case distinguishable. As Defendants point out, the Southern District of New York held that tolling was not supported by allegations that defendants "den[ied] that there was a defect when he brought his vehicle in for repair." Id. The plaintiff, there, however, admitted he "had knowledge of the facts for accrual of his claims against Defendants in 2012, brought his vehicle in for repair in 2013 and traded it in at some point in 2014, but did not join the lawsuit against defendant until December 2014.

### C. **Plaintiffs' Remaining Claims**

1. *Plaintiffs Breach of Express Warranty Claims Fail to State a Claim for plausible Relief*

Plaintiffs' maintain six claims for Breach of Express Warranty under California Counts IV and VI, Florida Count III, Kansas Count III, North Carolina Count III, New Jersey Count III, and New York Count IV. Their breach of warranty claims are premised on the New Vehicle Limited Warranty ("NVLW"). The NVLW "warrants to the original and each subsequent owner of a new Mercedes-Benz vehicle that any authorized Mercedes-Benz Center will make any repairs or replacements necessary, to correct defects in material or workmanship arising during the warranty period." (Compl. ¶ 159).[21] The warranty period covers Class Vehicles for 48 months or 50,000 miles, whichever occurs first. (Id.). With particular respect to Mercedes' paint, the warranty provides:

> Defects in paint, trim or other appearance items are normally taken care of during our new vehicle preparation or by the authorized Mercedes-Benz Center during new vehicle inspection. We suggest that if you find any paint or appearance problems that you advise your authorized Mercedes-Benz Center as soon as possible since deterioration due to use and exposure is not covered by the warranty.

 (Id.).

Defendants submit that all Plaintiffs' breach of express warranty claims fail because: (1) Plaintiffs plead no facts establishing that their vehicles remained under warranty at the time they sought repairs; (2) Plaintiff Salgado did not present his vehicle to an

---

[21] Defendant Daimler separately argues that Plaintiffs' fail to state a claim for breach of express warranty against it because Daimler did not issue any warranty to Plaintiffs, specifically claiming it is not a party to the NVLW. The Court declines to address this particular argument in light of finding, as explained below, that each of Plaintiffs' express warranty claims will be dismissed on alternative grounds.

authorized Mercedes-Benzes dealership for repair; and (3) California Plaintiffs failed to provide a Mercedes-Benzes dealer with a reasonable number of repair attempts, barring their Song-Beverly claim. [Dkt. No. 22 at 4-8].

The Court agrees with Defendants first argument, that all of the named Plaintiffs have failed to plead a breach of express warranty claim because each failed to allege facts that establish their Class Vehicles were covered under the express warranty at the time they sought repairs.

Coverage under the express warranty at issue, the NVLW, is limited in duration, not only by months but by miles, "whichever occurs first." Although the Complaint presents a timeline of when each named Plaintiff purchased their respective Class Vehicle, when they noticed the paint issue, and when they brought their vehicle to a dealership,[22] here, the Complaint fails to allege the mileage of any of the Class Vehicles, at any point in time. Therefore, named Plaintiffs' do not plead facts establishing that their vehicles remained under warranty when they noticed the alleged Paint Defect. Moreover, the factual allegations in the Complaint actually establish that a number of Plaintiffs discovered the alleged Paint Defect after the 48 month period and, therefore, indisputably after the expiration of their warranty.

Notably, Plaintiffs do not directly dispute that thier Class Vehicles were outside warranty when they first noticed the alleged Paint Defect or sought repairs. Instead,

---

[22] Plaintiffs provided an accurate timeline, supported by their Complaint. See Dkt. No. 27 at 33 n. 23 (Ponzio purchased his class vehicle in June 2013, discovered problems between August 2017 and February 2018, and brought his car to dealership in May 2018 (Compl. ¶¶ 15, 18); Kloczko purchased in May 2014, discovered problems in June 2017, and brought car to dealership shortly thereafter (Id. at ¶¶ 20, 23); Miller purchased in March 2017, discovered problems in February 2018, and brought car to dealership in May 2018 (¶¶26, 29); Acuna purchased in December 2014, discovered problems in 2015, and brought car to dealership in September 2016 (Id. at ¶¶ 36, 39); Madsen purchased and discovered problems in April 2018 and contacted dealership in May (Id. at ¶¶ 42, 45)).

they claim that "[Defendants] ignore[] how the discovery rule can toll the accrual of a warranty claim and the unconscionability of a warranty's durational limits can render claims made after the expiration of a warranty's coverage period timely." [Dkt. No. 27 at 32].

First, whether or not the discovery rule applies to toll the warranty claims of Plaintiffs' is inapposite. See Docteroff v. Barra Corp. of Am., 659 A.2d 948, 954 (N.J. Super. App. Div. 1995). Plaintiffs' argument is misplaced; the discovery rule concerns when a cause of action for a breach of warranty accrues, it does not control the time period in which a breach may occur. In other words, it does not alter the warranty period. See Philips v. Ford Motor Co., No. 14-CV-02989, 2015 WL 4111448, at *7 (N.D. Cal. July 7, 2015).

Second, it is established that "latent defects discovered after the term of the warranty are not actionable." Dewey v. Volkswagen AG, 558 F. Supp. 2d 505, 519 (D.N.J. 2008) (quoting Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 616 (3d Cir. 1995)).[23] To be sure, courts in each of the six relevant states have found that "[w]here the alleged

---

[23] Abraham v. Volkswagen of Am., Inc., 795 F.2d 238, 250 (2d Cir. 1986) ("The general rule is that an express warranty does not cover repairs made after the applicable time or mileage periods have elapsed."); Clemens v. DaimlerChrysler Corp., 534 F.3d 1017, 1022–23 (9th Cir. 2008) (agreeing with Abraham, and finding the same); Meyers v. Garmin Int'l, Inc., No. 13-CV-2416, 2014 WL 273983, at *6 (D. Kan. Jan. 24, 2014) ("At the outset, the court recognizes that 'mere knowledge that a part will ultimately fail, after the expiration of a warranty period, is insufficient to provide a basis for a breach of express warranty claim.'" (quoting Henderson v. Volvo Cars of N. Am., LLC, No. Civ. A. 09–4146, 2010 WL 2925913, at *9 (D.N.J. July 21, 2010))); Licul v. Volkswagen Grp. of Am., Inc., 2013 WL 6328734, at *4 (S.D. Fla. Dec. 5, 2013) ("Plaintiffs cannot bring a claim for breach of warranty because the defect they complain of manifested after the expiration of the express warranty. Volkswagen's alleged knowledge of the defect at the time of sale does not require a different outcome."); Bussian v. DaimlerChrysler Corp., 411 F. Supp. 2d 614, 621 (M.D.N.C. 2006) (citing to Abraham for the "nearly universally accepted proposition that a latent vehicle defect known to the manufacturer at the time of sale that does not manifest itself until after expiration of the express warranty does not, in and of itself, give rise to a breach of express warranty claim").

breach regards a latent defect that manifests outside the period covered by the warranty, a plaintiff may <u>sometimes</u> state a claim if he alleges that the warranty was unconscionable." <u>Skeen v. BMW of N. Am., LLC</u>, No. 2:13-CV-1531, 2014 WL 283628, at *12 (D.N.J. Jan. 24, 2014) (emphasis added); <u>Meyers</u>, 2014 WL 273983, at *6 (finding that the "knowledge that a part will ultimately fail, after the expiration of a warranty period . . . 'does not alone make [a] limitation unconscionable.'" (quoting <u>Henderson</u>, 2010 WL 2925913, at *9)); <u>Marchante v. Sony Corp. of Am.</u>, 801 F. Supp. 2d 1013, 1022 (S.D. Cal. 2011); <u>Garcia v. Chrysler Grp. LLC</u>, 127 F. Supp. 3d 212, 228 (S.D.N.Y. 2015); <u>Licul</u>, 2013 WL 6328734, at *4; <u>Bussian</u>, 411 F. Supp. at 619.

The "basic test" for unconscionability is "whether, in light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract." U.C.C. § 2–302;[24] <u>Pendergast v. Sprint Nextel Corp.</u>, 592 F.3d 1119, 1134 (11th Cir. 2010); <u>Tillman v. Commercial Credit Loans, Inc.</u>, 655 S.E. 2d 362 (N.C. 2008). Generally, Plaintiff is required to allege facts to state a plausible claim that the contract was both procedurally and substantively unconscionable.[25] In analyzing procedural unconscionability, courts look to the circumstance surrounding the formation of the contract. <u>In re Caterpillar, Inc., C13 & C15 Engine Prod. Liab. Litig.</u>, No. 1:14-CV-3722, 2015 WL 4591236, at *20 (D.N.J. July 29, 2015). "Procedural unconscionability includes, among other things, various

---

[24] California, Kansas, New Jersey and New York have all adopted the Article 2 of the UCC.
[25] <u>Skeen</u>, 2014 WL 283628, at *14 (D.N.J. Jan. 24, 2014); <u>Gillman v. Chase Manhattan Bank, N.A.</u>, 534 N.E.2d 824, 828 (N.Y. 1988); Licul v. Volkswagen Grp. of Am., Inc., 2013 WL 6328734, at *4 (S.D. Fla. Dec. 5, 2013); <u>Rite Color Chem. Co. v. Velvet Textile Co.</u>, 411 S.E.2d 645, 648–49 (N.C. App. 1992); <u>Aron v. U–Haul Co. of Cal.</u>, 49 Cal. Rptr. 3d 555, 564 (Cal. Ct. App. 2006).

inadequacies like age, literacy, and lack of sophistication." <u>Travelodge Hotels, Inc. v. Honeysuckle Enterprises, Inc.</u>, 357 F. Supp. 2d 788, 801 (D.N.J. 2005) (citations omitted). "Substantive unconscionability describes an exchange of promises that is so one-sided as to "shock the conscience of the court." <u>Id.</u>; <u>Skeen</u> at 2014 WL 283628 at *13.

Here, Plaintiffs argue that "MBUSA's pre-sale knowledge, and subsequent concealment, of the Paint Defect further supports unconscionability. . . . where a defendant has pre-sale knowledge of a defect, any attempt to impose limitations or uphold disclaimers is unconscionable." [Dkt. No. 27 at 32-33]. This is not always true. In fact, New Jersey District Courts have "held that a manufacturer's knowledge that a part may ultimately fail does not, alone, make a time/mileage limitation unconscionable." <u>Merkin v. Honda N. Am., Inc.</u>, No. 17CV03625, 2017 WL 5309623, at *5 (D.N.J. Nov. 13, 2017) (citing <u>Henderson</u>, 2010 WL 2925913 (D.N.J. July 21, 2010)).

Similarly, the Fourth Circuit has recognized that while knowledge of a defect "may be evidence of the kind of disparity in bargaining power and unfair surprise often indicative of procedural unconscionability," advance knowledge does not necessarily establish substantive unconscionability. <u>Hart v. Louisiana-Pac. Corp.</u>, 641 F. App'x 222, 228 (4th Cir. 2016). Additionally, the circuit court clarified that it does not read its earlier precedent—<u>Carlson v. Gen. Motors Corp.</u>, 883 F.2d 287, 293 (4th Cir. 1989), cited by Plaintiffs here—"for the broad proposition that the *terms* of a warranty are necessarily substantively unconscionable solely because one party conceals certain information during the bargaining process." <u>Id.</u>

Furthermore, as the Ninth Circuit has explained:

> Every manufactured item is defective at the time of sale in the sense that it will not last forever; the flip-side of this original sin is the product's useful life. If a manufacturer determines that useful life and warrants the product for a lesser period of time, we can hardly say that the warranty is implicated when the item fails after the warranty period expires. The product has performed as expressly warranted. Claims regarding other buyer expectations and the manufacturer's state of mind properly sound in fraud and implied warranty.

Clemens v. DaimlerChrysler Corp., 534 F.3d 1017, 1022–23 (9th Cir. 2008); see also Chiarelli v. Nissan N. Am., Inc., No. 14-CV-4327, 2015 WL 5686507, at *7 (E.D.N.Y. Sept. 25, 2015) ("The case law is clear, moreover, that a defendant's knowledge of a latent defect does not render unconscionable a limitation contained in an express warranty.").

Accordingly, the Court must focus on the particular facts Plaintiffs have pled in their Complaint to support a plausible claim that Mercedes' express warranty is unconscionable. Plaintiffs allegations under their nationwide MMWA claim pleads unconscionability of the NVLA (or CPOLW, which does not cover paint defects). (Compl. ¶¶ 237-39). A reasonable reading of the Complaint provides that the warranties are procedurally unconscionable (1) due to the unequal bargaining power between Mercedes and Plaintiffs and Class members; and (2) because "at the time of purchase and lease, Plaintiffs and Class members had no other options for purchasing warranty coverage other than directly from Mercedes." (Id. at ¶ 238). Plaintiffs further allege that the warranties are substantively unconscionable in that "Mercedes knew that the Class Vehicles were defective and would continue to pose safety risks and quality concerns after the warranties purportedly expired" and failed to disclose this knowledge. "Thus, Mercedes' enforcement of the durational limitations on those warranties is harsh and shocks the conscience." (Id. at ¶ 239).

Defendants' argue that Plaintiffs' allegations of unconscionability are conclusory and therefore, are insufficient to show that the NVLW is unconscionable. The Court agrees. Here, Plaintiffs' allegations are inadequate to surpass a motion to dismiss, particularly because they fail to sufficiently allege substantive unconscionability.[26]

As an initial matter, this Court recently discussed whether plaintiffs had sufficiently pled that a car manufactures durational warranty was unconscionable, in Amato v. Subaru of Am., Inc., 2019 WL 6607148, at *8-10 (D.N.J. Dec. 5, 2019). In so doing, this Court reviewed extensive case law from this district and agreed that conclusory allegations of substantive unconscionability based on a defendants knowledge of a latent defect are insufficient to withstand a motion to dismiss. See Id.

More specifically, courts in this district and those in each named Plaintiffs' state, have found that merely alleging that a defendant knew of a defect, and knew that defect would arise after the time limitations of a warranty, but concealed that information, without more, fails to establish unconscionability.

> Manufacturers always have knowledge regarding the effective life of particular parts and the likelihood of their failing within a particular period of time. Such knowledge is easily demonstrated by the fact that manufacturers must predict rates of failure of particular parts in order to

---

[26] See Alban v. BMW of N. Am., No. CIV. 09-5398, 2011 WL 900114, at *8 (D.N.J. Mar. 15, 2011) (finding the plaintiff's allegations insufficient to state a claim for unconscionability where plaintiff's complaint pled that at the time he purchased his vehicle, BMW "(1) knew of the defect in the sound insulation, (2) knew that the defect would not become apparent until after the 4 year/50,000 mile period had passed, and (3) as a result, concealed material information that prevented [him] from bargaining for a warranty that would cover the known defect." (internal quotations omitted)); Chiarelli v. Nissan N. Am., Inc., No. 14-CV-4327, 2015 WL 5686507, at *7 (E.D.N.Y. Sept. 25, 2015) (holding that plaintiff did not sufficiently plead a claim that defendant's warranty was unconscionable, citing to New Jersey District Court cases, finding Alban particularly persuasive); Licul, 2013 WL 6328734, at *4 (rejecting Plaintiffs' contention that the durational limits on the Jetta's express warranty are unconscionable "Volkswagen's alleged knowledge of the defect at the time of sale does not require a different outcome. Nor have Plaintiffs pled facts that would justify ignoring the warranty's durational limitations on unconscionability grounds.").

> price warranties and thus can always be said to "know" that many parts will fail after the warranty period has expired. A rule that would make failure of a part actionable based on such "knowledge" would render meaningless time/mileage limitations in warranty coverage.

Abraham v. Volkswagen of Am., Inc., 795 F.2d 238, 250 (2d Cir. 1986). Many courts have decided to follow the Second Circuit's line of reasoning in Abraham. See, e.g., supra, note 23. To that end, as currently alleged, Plaintiffs fail to revive their breach of express warranty claim by its conclusory allegations regarding substantive unconscionability. Majdipour v. Jaguar Land Rover N. Am., LLC, No. 2:12-CV-07849, 2013 WL 5574626, at *20 (D.N.J. Oct. 9, 2013) ("There is nothing substantively unconscionable about a 6 year/75,000 mile warranty per se. The allegations that Land Rover knew that the Defect might manifest after the express warranty term do not implicate the conscionability of that term." (citing Nelson v. Nissan N. Am., Inc., 894 F. Supp. 2d 558, 565–66 (D.N.J. 2012)).[27] Accordingly, Plaintiffs Complaint does not establish unconscionability of a warranty's durational limits so as to render any named Plaintiffs' claims made after the expiration of a warranty's coverage period timely. Therefore, the Court will grant Defendants' Motions to Dismiss all named Plaintiffs' Breach of Express Warranty Claims.[28]

### 2. *Plaintiffs' Breach of Implied Warranty Claims*

"Plaintiffs have decided to not move forward with their claims based on MBUSA's breach of implied warranty, and voluntarily consent to their dismissal." [Dkt. No. 27 at

---

[27] See also Knopke v. Ford Motor Co., No. 14-2225, 2014 U.S. Dist. LEXIS 158928, at *16 (D. Kan. Nov. 10, 2014) ("[U]nconscionability is to be measured at the inception of the contract. It is insufficient to plausibly state that the contract was unconscionable at its inception by alleging that Ford later learned of the defect and concealed it.").

[28] This failure also warrants dismissal of California Plaintiffs' claims under the Song-Beverly Act. See Marchante v. Sony Corp. of Am., 801 F. Supp. 2d 1013, 1021 (S.D. Cal. 2011).

32 n.22]. Therefore, California Counts III and V, Kansas Count II, Florida Count II, New Jersey Count II, New York Count III, and North Carolina Count II will be dismissed.

    *3.  Plaintiffs' Unjust Enrichment Claims (COUNT II)*

Plaintiffs bring an unjust enrichment claim under Count II as an alternative to their contractual warranty claims. Defendants indicate that the requirements to establish unjust enrichment in the six home states of named Plaintiffs conflict with one another and argue for dismissal of the nationwide claim on that basis. To reiterate, the Court will not permit a nationwide unjust enrichment claim at this juncture but allows the claim to proceed as to named Plaintiffs, under their respective states' laws. After review of the factual allegations in the Complaint, however, Plaintiffs' unjust enrichment claim fails under California, Kansas, Florida, New Jersey, New York, and North Carolina law.

  "Generally, to claim unjust enrichment, a plaintiff must allege that (1) at plaintiff's expense (2) defendant received benefit (3) under circumstances that would make it unjust for defendant to retain benefit without paying for it." In re K-Dur Antitrust Litig., 338 F. Supp. 2d 517, 544 (D.N.J. 2004) (citing RESTATEMENT OF RESTITUTION § 1 (1937)). Although litigants may plead alternative and inconsistent claims, Fed. R. Civ. P. 8(d)(2) & (3), courts in all six relevant states, have on numerous occasions dismissed under Rule 12(b)(6) unjust enrichment claims that relate to the same subject matter as valid contracts.[29]

---

[29] See, e.g., Estate of Gleiberman v. Hartford Life Ins. Co., 94 Fed. Appx. 944, 947 (3d Cir. 2004); In re: Gen. Motors LLC Ignition Switch Litig., No. 14-MC-2543, 2016 WL 3920353, at *23 (S.D.N.Y. July 15, 2016); Orica New Zealand Ltd. v. Searles Valley Minerals Operations Inc., No. CIV.A. 04-2310, 2005 WL 387659, at *3 (D. Kan. Feb. 17, 2005); Madison River Mgmt. Co. v. Bus. Mgmt. Software Corp., 351 F. Supp. 2d 436, 446 (M.D.N.C. 2005); Wilson v. Everbank, N.A., 77 F. Supp. 3d 1202, 1220 (S.D. Fla. 2015); Gerstle, 2017 WL 2797810, at *7.

The essence of Plaintiffs' unjust enrichment claim is that Mercedes has financially benefited from selling defective vehicles to Plaintiffs and class members for more than their worth. (Compl. ¶¶ 220-23). Plaintiffs' claim that "Mercedes will be unjustly enriched if it is allowed to retain the revenues obtained through falsehoods, deception, and misrepresentations, Plaintiffs and each Class member are entitled to recover the amount by which Mercedes was unjustly enriched at his or her expense." (Id.).

Without differing between states, Defendants' first contend that Count II is precluded by Plaintiffs' breach of express warranty claim. [Dkt. No. 22 at 16]. There is no dispute that Plaintiffs' NVWL is an express warranty that governs the underlying conduct at the heart of this case. However, Plaintiffs contest the validity of that contract in alleging that the warranty is unconscionable. Although Plaintiffs' complaint fails to sufficiently allege unconscionability, this Court has not determined, at this stage, that the contract is, in fact, valid. Where plaintiffs contest the enforceability of an express contract, the existence of that contract does not automatically preclude an alternative claim for unjust enrichment. See Price v. L'Oreal USA, Inc., No. 17 CIV. 0614, 2017 WL 4480887, at *5 (S.D.N.Y. Oct. 5, 2017). Therefore, the Court will not dismiss Plaintiffs' unjust enrichment claim on the sole basis that an express contract exists.

Nevertheless, a plaintiff cannot sustain an unjust enrichment claim where there is an adequate remedy at law.[30] Plaintiffs, here, also maintain an adequate remedy at law. To

---

[30] Huu Nguyen v. Nissan N. Am., Inc., No. 16-CV-05591, 2017 WL 1330602, at *4–5 (N.D. Cal. Apr. 11, 2017); Matthews v. Am. Honda Motor Co., No. 12-60630, 2012 WL 2520675, at *2 (S.D. Fla. June 6, 2012) ("It is well-established under Florida law that unjust enrichment is an equitable remedy that is available only when the plaintiff lacks an adequate remedy at law."); Price v. L'Oreal USA, Inc., No. 17 CIV. 0614, 2017 WL 4480887, at *5 (S.D.N.Y. Oct. 5, 2017); Thompkins v. Key Health Med. Sols., Inc., No. 1:12CV613, 2015 WL 1292228, at *10 (M.D.N.C. Mar. 23, 2015) ("Of note, a party cannot maintain a claim for unjust enrichment where an adequate remedy at law exists." (citation omitted)); Ice Corp. v. Hamilton Sundstrand Inc., 444 F. Supp. 2d 1165, 1170–71 (D. Kan. 2006).

be sure, Plaintiffs claim that they have in fact pled a "lack of adequate remedy" at law, but the Complaint lacks any allegations to support such a conclusion. To the contrary, all Plaintiffs in this case have pled statutory consumer fraud claims. Indeed, Plaintiffs have made clear that the heart of this case deals with the alleged misrepresentations and fraud of Defendants. This wrongful conduct is the basis for each statutory fraud claim, which is the exact basis for Plaintiffs' unjust enrichment claim, in which Plaintiffs assert Defendants' will be unjustly enriched if it is allowed to retain the revenues obtained through falsehoods, deception, and misrepresentations. (Compl. 220-23).[31]

On occasion, courts in this district are reluctant to dismiss pursuant to 12(b)(6), a plaintiff's unjust enrichment claim solely because they there is another remedy at law available. See Coyle v. Hornell Brewing Co., No. CIV.08-02797 , 2010 WL 2539386, at *5 (D.N.J. June 15, 2010) ("It is true that restitution for unjust enrichment is an equitable remedy that is unavailable when a plaintiff has an adequate remedy at law. However, it is equally true that plaintiffs are permitted to plead alternative theories of recovery." (citation omitted)); In re K–Dur Antitrust Litigation, 338 F.Supp.2d 517, 544

---

[31] See Embree Const. Group, Inc. v. Rafcor, Inc., S.E.2d 916, 920 (N.C. 1992) ("The court's equitable intervention is obviated when an adequate remedy at law is available to the plaintiff."); Prohias v. Pfizer, Inc., 490 F.Supp.2d 1228, 1236–37 (S.D. Fla. 2007) ("[I]n their unjust enrichment claim, the plaintiffs seek recovery for the exact same wrongful conduct as in their consumer fraud act claim. If [the defendant's] marketing scheme is misleading, and if the plaintiffs have been damaged by such scheme, then the plaintiffs have a remedy at law as a properly pled claim under the consumer fraud acts ...."); L'Oreal USA, Inc., 2017 WL 4480887, at *5 ("This is not the unusual situation where there is no adequate remedy at law. Plaintiff asserts both conventional contract and tort claims based on the same set of facts."). All of the claims in the Complaint are based on the same alleged misrepresentation by Defendants that the Products contain keratin. Plaintiffs failure to do so warrants dismissal of Count II under a majority of the relevant states. Huu Nguyen, 2017 WL 1330602, at *4–5 (dismissing the plaintiff's claim for unjust enrichment where plaintiff had an "'adequate remedy at law' in the form of Plaintiff's claims for damages"); Matthews, 2012 WL 2520675, at *2 ("because Matthews' unjust enrichment claim is predicated on the same wrongful conduct as her FDUTPA claim, she does not lack an adequate legal remedy.").

(D.N.J.2004) (finding dismissal of plaintiff's unjust enrichment claim premature despite the availability of other adequate remedies at law). Accordingly, Defendants further argue that Plaintiff Ponzio's unjust enrichment claim independently fails under New Jersey law because "plaintiffs are required to allege 'a direct relationship between the parties' or that they conferred a direct benefit on MBUSA." [Dkt. No. 22 at 16 (citing to Hughes v. Panasonic Consumer Elecs. Co.,2011 U.S. Dist. LEXIS 79504, at *78 (D.N.J. July 21, 2011))]. The Court agrees.

"[I]t is the plaintiff's (as opposed to a third party's) conferral of a benefit on defendant which forms the basis of an unjust enrichment claim." Eli Lilly & Co. v. Roussel Corp., 23 F. Supp. 2d 460, 496 (D.N.J. 1998). Here, Plaintiff Ponzio purchased his Class Vehicle from an authorized Mercedes-Benz dealer in Cherry Hill, New Jersey, a third party. (Compl. ¶ 15). "In New Jersey, a benefit conferred upon a retailer not sharing in profits with the product manufacturer does not result in the manufacturer's unjust enrichment." Alin v. Am. Honda Motor Co., No. CIV A 08-4825, 2010 WL 1372308, at *15 (D.N.J. Mar. 31, 2010) (citing Cooper v. Samsung Electronics America, Inc., 2008 WL 4513924, at *10 (D.N.J. Sept.30, 2008)). Plaintiffs fail to allege (1) a relationship between Mercedes dealerships and MBUSA, and (2) how revenue to any dealer unjustly enriched MBUSA. See Id. at *41 (finding that "because [plaintiff] did not allege that the [Honda authorized dealership] gave, or was required to give, its profits from the purchase to Honda, he failed to properly plead a direct relationship between the parties.").

Here, Plaintiffs allege that "Mercedes has received millions in revenue from the sale of the Class Vehicles between 2004 and 2017," and such revenue benefited Mercedes. (Id. at ¶¶ 220-21). But the Complaint lacks any facts to support such a conclusion.

Hughes v. Panasonic Consumer Elecs. Co., No. CIV.A. 10-846, 2011 WL 2976839, at *27 (D.N.J. July 21, 2011) ("[I]f a plaintiff purchases a product from a third party retailer, rather than the defendant, then no direct relationship exists where the plaintiff purchaser conferred a benefit on the defendant.").[32]

To be sure, Plaintiffs allege privity of contract between themselves and Defendants and claim that they are third-party beneficiaries of Defendants' warranties. Specifically, they assert in their complaint that:

> Plaintiffs and each of the other Class members have had sufficient direct dealings with either Mercedes or its agents (dealerships) to establish privity of contract between Mercedes, on the one hand, and Plaintiffs and each of the other Class members, on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Mercedes and its dealers, and specifically, of Mercedes' warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for, and intended to, benefit consumers.

(Compl. ¶ 240). In Alin, the plaintiff maintained similar allegations and argued that "the direct relationship between Honda and himself was established when he leased the vehicle and received Honda's express written warranty." Alin, 2010 WL 1372308, at *15. The Court rejected that argument. Plaintiffs here cite no authority that any such allegation is sufficient to state a direct relationship. Instead, Plaintiffs argue that their

---

[32] Bedi v. BMW of N. Am., LLC, No. CV 15-1898, 2016 WL 324950, at *6 (D.N.J. Jan. 27, 2016) (finding no direct relationship between plaintiff and car manufacturer defendant, where plaintiff purchased his vehicle from an authorized dealership); Merkin, 2017 WL 5309623, at *6 ("Plaintiff purchased his vehicle from an authorized Honda retailer, not Honda. As such, no direct relationship has been demonstrated and, therefore, Plaintiff has not stated a claim for unjust enrichment"); Block v. Jaguar Land Rover N. Am., LLC, No. CV 15-5957, 2017 WL 902860, at *2 (D.N.J. Mar. 7, 2017), modified on reconsideration, 2017 WL 1496926 (D.N.J. Apr. 25, 2017) ("'direct relationship' requires that the plaintiff expected remuneration from the defendant at the time the benefit was conferred.").

"allegations demonstrate that an indirect benefit was conferred on MBUSA when they purchased their Class Vehicles (whether new or used) from MBUSA authorized dealerships, which serves as a sufficient basis for their claims of unjust enrichment under the laws of the states at issue." This is insufficient under New Jersey law, and Plaintiffs cite no New Jersey case law to otherwise support their argument.

Accordingly, all of the named Plaintiffs fail to state a plausible claim for unjust enrichment. The unjust enrichment claim, therefore, will be dismissed entirely, and the Court will grant the Defendants' Motions to Dismiss Nationwide Count II.

VI.     Conclusion

For the forgoing reasons, the Court will grant in part and deny in part Defendant MBUSA's Motion to Dismiss [Dkt. No. 22]; and the Court will grant in part and deny in part Defendant Daimler's Motion to Dismiss [Dkt. No. 37].

An appropriate order shall issue.


Dated: March 11, 2020


                                                      /s/ Joseph H. Rodriguez
                                                 Hon. Joseph H. Rodriguez,
                                                 UNITED STATES DISTRICT JUDGE